# CITY OF MONTEREY *v.* DEL MONTE DUNES AT MONTEREY, LTD., ET AL.

No. 97–1235.   Argued October 7, 1998—Decided May 24, 1999

688

KENNEDY, J., announced the judgment of the Court and delivered the opinion for a unanimous Court with respect to Parts I and II, the opinion of the Court with respect to Parts III, IV–A–1, IV–B, IV–C, and V, in which REHNQUIST, C. J., and STEVENS, SCALIA, and THOMAS, JJ., joined, and an opinion with respect to Part IV–A–2, in which REHNQUIST, C. J., and STEVENS and THOMAS, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 723. SOUTER, J., filed an opinion concurring in part and dissenting in part, in which O'CONNOR, GINSBURG, and BREYER, JJ., joined, *post*, p. 733.

*George A. Yuhas* argued the cause for petitioner. With him on the briefs was *Richard E. V. Harris.*

*Deputy Solicitor General Kneedler* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Schiffer, Malcolm L. Stewart, David C. Shilton, Timothy J. Dowling,* and *Nina Mendelson.*

*Michael M. Berger* argued the cause for respondents. With him on the brief was *Frederik A. Jacobsen.**

*Briefs of *amici curiae* urging reversal were filed for the State of New Jersey et al. by *Peter Verniero,* Attorney General of New Jersey, *Stefanie A. Brand,* Deputy Attorney General, *Mary C. Jacobson,* Assistant Attorney General, *Dan Schweitzer,* and *Gus F. Diaz,* Acting Attorney General of Guam, and by the Attorneys General for their respective jurisdictions as follows: *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Winston*

JUSTICE KENNEDY delivered the opinion of the Court, except as to Part IV–A–2.

This case began with attempts by respondent Del Monte Dunes and its predecessor in interest to develop a parcel of land within the jurisdiction of the petitioner, the

Bryant of Arkansas, Richard Blumenthal of Connecticut, M. Jane Brady of Delaware, Robert A. Butterworth of Florida, Margery S. Bronster of Hawaii, Alan G. Lance of Idaho, Jim Ryan of Illinois, Jeffrey A. Modisett of Indiana, Thomas J. Miller of Iowa, Andrew Ketterer of Maine, J. Joseph Curran, Jr., of Maryland, Frank J. Kelley of Michigan, Hubert H. Humphrey III of Minnesota, Joseph P. Mazurek of Montana, Philip T. McLaughlin of New Hampshire, Tom Udall of New Mexico, Dennis C. Vacco of New York, Michael F. Easley of North Carolina, Heidi Heitkamp of North Dakota, Hardy Myers of Oregon, Jeffrey B. Pine of Rhode Island, John Knox Walkup of Tennessee, William H. Sorrell of Vermont, Mark L. Earley of Virginia, Christine O. Gregoire of Washington, and Darrell V. McGraw, Jr., of West Virginia; for the City and County of San Francisco et al. by Louise H. Renne, Dennis Aftergut, Andrew W. Schwartz, Pamela Albers, Gary T. Ragghianti, Zach Cowan, Ronald R. Ball, John L. Cook, Joel D. Kuperberg, Edward J. Foley, Philip D. Kohn, Lois E. Jeffrey, John Sanford Todd, William W. Wynder, Steven F. Nord, Thomas B. Brown, George H. Eiser III, James R. Anderson, Monte L. Widders, Gary Gillig, Debra S. Margolis, Michael F. Dean, Stan Yamamoto, Hadden Roth, C. Alan Sumption, Daniel J. Wallace, John G. Barisone, Rene Auguste Chouteau, Victor J. Westman, Norman Y. Herring, Cameron L. Reeves, H. Peter Klein, Alan Seltzer, and Dwight L. Herr; for the American Planning Association by Robert H. Freilich and Terry D. Morgan; for the League for Coastal Protection et al. by John D. Echeverria; for the Municipal Art Society of New York, Inc., by Michael B. Gerrard, Michael S. Gruen, Dennis C. O'Donnell, John J. Kerr, Jr., Norman Marcus, and Otis Pratt Pearsall; and for the National League of Cities et al. by Richard Ruda and James I. Crowley.

Briefs of amici curiae urging affirmance were filed for the American Farm Bureau Federation et al. by Timothy S. Bishop, Jeffrey W. Sarles, John J. Rademacher, Nancy N. McDonough, and Carolyn S. Richardson; for the California Association of Realtors et al. by Roger J. Marzulla; for Defenders of Property Rights et al. by Nancie G. Marzulla; for the Institute for Justice by William H. Mellor, Clint Bolick, Scott G. Bullock, and Richard A. Epstein; for the National Association of Home Builders et al. by Gus Bauman, Mary V. DiCrescenzo, and Nick Cammarota; for the Pacific Legal Foundation et al. by James S. Burling; and for the Washington Legal Foundation et al. by Daniel J. Popeo and Paul D. Kamenar.

city of Monterey. The city, in a series of repeated rejections, denied proposals to develop the property, each time imposing more rigorous demands on the developers. Del Monte Dunes brought suit in the United States District Court for the Northern District of California, under Rev. Stat. § 1979, 42 U. S. C. § 1983. After protracted litigation, the case was submitted to the jury on Del Monte Dunes' theory that the city effected a regulatory taking or otherwise injured the property by unlawful acts, without paying compensation or providing an adequate postdeprivation remedy for the loss. The jury found for Del Monte Dunes, and the Court of Appeals affirmed.

The petitioner contends that the regulatory takings claim should not have been decided by the jury and that the Court of Appeals adopted an erroneous standard for regulatory takings liability. We need not decide all of the questions presented by the petitioner, nor need we examine each of the points given by the Court of Appeals in its decision to affirm. The controlling question is whether, given the city's apparent concession that the instructions were a correct statement of the law, the matter was properly submitted to the jury. We conclude that it was, and that the judgment of the Court of Appeals should be affirmed.

## I

### A

The property which Del Monte Dunes and its predecessor in interest (landowners) sought to develop was a 37.6-acre ocean-front parcel located in the city of Monterey, at or near the city's boundary to the north, where Highway 1 enters. With the exception of the ocean and a state park located to the northeast, the parcel was virtually surrounded by a railroad right-of-way and properties devoted to industrial, commercial, and multifamily residential uses. The parcel itself was zoned for multifamily residential use under the city's general zoning ordinance.

The parcel had not been untouched by its urban and industrial proximities. A sewer line housed in 15-foot man-made dunes covered with jute matting and surrounded by snow fencing traversed the property. Trash, dumped in violation of the law, had accumulated on the premises. The parcel had been used for many years by an oil company as a terminal and tank farm where large quantities of oil were delivered, stored, and reshipped. When the company stopped using the site, it had removed its oil tanks but left behind tank pads, an industrial complex, pieces of pipe, broken concrete, and oil-soaked sand. The company had introduced nonnative ice plant to prevent erosion and to control soil conditions around the oil tanks. Ice plant secretes a substance that forces out other plants and is not compatible with the parcel's natural flora. By the time the landowners sought to develop the property, ice plant had spread to some 25 percent of the parcel, and, absent human intervention, would continue to advance, endangering and perhaps eliminating the parcel's remaining natural vegetation.

The natural flora the ice plant encroached upon included buckwheat, the natural habitat of the endangered Smith's Blue Butterfly. The butterfly lives for one week, travels a maximum of 200 feet, and must land on a mature, flowering buckwheat plant to survive. Searches for the butterfly from 1981 through 1985 yielded but a single larva, discovered in 1984. No other specimens had been found on the property, and the parcel was quite isolated from other possible habitats of the butterfly.

B

In 1981 the landowners submitted an application to develop the property in conformance with the city's zoning and general plan requirements. Although the zoning requirements permitted the development of up to 29 housing units per acre, or more than 1,000 units for the entire parcel, the landowners' proposal was limited to 344 residential units. In 1982 the city's planning commission denied the application

but stated that a proposal for 264 units would receive favorable consideration. In keeping with the suggestion, the landowners submitted a revised proposal for 264 units. In late 1983, however, the planning commission again denied the application. The commission once more requested a reduction in the scale of the development, this time saying a plan for 224 units would be received with favor. The landowners returned to the drawing board and prepared a proposal for 224 units, which, its previous statements notwithstanding, the planning commission denied in 1984. The landowners appealed to the city council, which overruled the planning commission's denial and referred the project back to the commission, with instructions to consider a proposal for 190 units.

The landowners once again reduced the scope of their development proposal to comply with the city's request, and submitted four specific, detailed site plans, each for a total of 190 units for the whole parcel. Even so, the planning commission rejected the landowners' proposal later in 1984. Once more the landowners appealed to the city council. The council again overruled the commission, finding the proposal conceptually satisfactory and in conformance with the city's previous decisions regarding, *inter alia*, density, number of units, location on the property, and access. The council then approved one of the site plans, subject to various specific conditions, and granted an 18-month conditional use permit for the proposed development.

The landowners spent most of the next year revising their proposal and taking other steps to fulfill the city's conditions. Their final plan, submitted in 1985, devoted 17.9 of the 37.6 acres to public open space (including a public beach and areas for the restoration and preservation of the buckwheat habitat), 7.9 acres to open, landscaped areas, and 6.7 acres to public and private streets (including public parking and access to the beach). Only 5.1 acres were allocated to buildings and patios. The plan was designed, in accordance with

the city's demands, to provide the public with a beach, a buffer zone between the development and the adjoining state park, and view corridors so the buildings would not be visible to motorists on the nearby highway; the proposal also called for restoring and preserving as much of the sand dune structure and buckwheat habitat as possible consistent with development and the city's requirements.

After detailed review of the proposed buildings, roads, and parking facilities, the city's architectural review committee approved the plan. Following hearings before the planning commission, the commission's professional staff found the final plan addressed and substantially satisfied the city's conditions. It proposed the planning commission make specific findings to this effect and recommended the plan be approved.

In January, 1986, less than two months before the landowners' conditional use permit was to expire, the planning commission rejected the recommendation of its staff and denied the development plan. The landowners appealed to the city council, also requesting a 12-month extension of their permit to allow them time to attempt to comply with any additional requirements the council might impose. The permit was extended until a hearing could be held before the city council in June 1986. After the hearing, the city council denied the final plan, not only declining to specify measures the landowners could take to satisfy the concerns raised by the council but also refusing to extend the conditional use permit to allow time to address those concerns. The council's decision, moreover, came at a time when a sewer moratorium issued by another agency would have prevented or at least delayed development based on a new plan.

The council did not base its decision on the landowners' failure to meet any of the specific conditions earlier prescribed by the city. Rather, the council made general findings that the landowners had not provided adequate access for the development (even though the landowners had twice

changed the specific access plans to comply with the city's demands and maintained they could satisfy the city's new objections if granted an extension), that the plan's layout would damage the environment (even though the location of the development on the property was necessitated by the city's demands for a public beach, view corridors, and a buffer zone next to the state park), and that the plan would disrupt the habitat of the Smith's Blue Butterfly (even though the plan would remove the encroaching ice plant and preserve or restore buckwheat habitat on almost half of the property, and even though only one larva had ever been found on the property).

C

After five years, five formal decisions, and 19 different site plans, 10 Tr. 1294–1295 (Feb. 9, 1994), Del Monte Dunes decided the city would not permit development of the property under any circumstances. Del Monte Dunes commenced suit against the city in the United States District Court for the Northern District of California under 42 U. S. C. § 1983, alleging, *inter alia*, that denial of the final development proposal was a violation of the due process and equal protection provisions of the Fourteenth Amendment and an uncompensated, and so unconstitutional, regulatory taking.

The District Court dismissed the claims as unripe under *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172 (1985), on the grounds that Del Monte Dunes had neither obtained a definitive decision as to the development the city would allow nor sought just compensation in state court. The Court of Appeals reversed. 920 F. 2d 1496 (CA9 1990). After reviewing at some length the history of attempts to develop the property, the court found that to require additional proposals would implicate the concerns about repetitive and unfair procedures expressed in *MacDonald, Sommer & Frates* v. *Yolo*

*County,* 477 U. S. 340, 350, n. 7 (1986), and that the city's decision was sufficiently final to render Del Monte Dunes' claim ripe for review. 920 F. 2d, at 1501–1506. The court also found that because the State of California had not provided a compensatory remedy for temporary regulatory takings when the city issued its final denial, see *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles,* 482 U. S. 304 (1987), Del Monte Dunes was not required to pursue relief in state court as a precondition to federal relief. See 920 F. 2d, at 1506–1507.

On remand, the District Court determined, over the city's objections, to submit Del Monte Dunes' takings and equal protection claims to a jury but to reserve the substantive due process claim for decision by the court. Del Monte Dunes argued to the jury that, although the city had a right to regulate its property, the combined effect of the city's various demands—that the development be invisible from the highway, that a buffer be provided between the development and the state park, and that the public be provided with a beach—was to force development into the "bowl" area of the parcel. As a result, Del Monte Dunes argued, the city's subsequent decision that the bowl contained sensitive buckwheat habitat which could not be disturbed blocked the development of any portion of the property. See 10 Tr. 1288–1294, 1299–1302, 1317 (Feb. 9, 1994). While conceding the legitimacy of the city's stated regulatory purposes, Del Monte Dunes emphasized the tortuous and protracted history of attempts to develop the property, as well as the shifting and sometimes inconsistent positions taken by the city throughout the process, and argued that it had been treated in an unfair and irrational manner. Del Monte Dunes also submitted evidence designed to undermine the validity of the asserted factual premises for the city's denial of the final proposal and to suggest that the city had considered buying, or inducing the State to buy, the property for

public use as early as 1979, reserving some money for this purpose but delaying or abandoning its plans for financial reasons. See *id.*, at 1303–1306. The State of California's purchase of the property during the pendency of the litigation may have bolstered the credibility of Del Monte Dunes' position.

At the close of argument, the District Court instructed the jury it should find for Del Monte Dunes if it found either that Del Monte Dunes had been denied all economically viable use of its property or that "the city's decision to reject the plaintiff's 190 unit development proposal did not substantially advance a legitimate public purpose." App. 303. With respect to the first inquiry, the jury was instructed, in relevant part, as follows:

> "For the purpose of a taking claim, you will find that the plaintiff has been denied all economically viable use of its property, if, as the result of the city's regulatory decision there remains no permissible or beneficial use for that property. In proving whether the plaintiff has been denied all economically viable use of its property, it is not enough that the plaintiff show that after the challenged action by the city the property diminished in value or that it would suffer a serious economic loss as the result of the city's actions." *Ibid.*

With respect to the second inquiry, the jury received the following instruction:

> "Public bodies, such as the city, have the authority to take actions which substantially advance legitimate public interest[s] and legitimate public interest[s] can include protecting the environment, preserving open space agriculture, protecting the health and safety of its citizens, and regulating the quality of the community by looking at development. So one of your jobs as jurors is to decide if the city's decision here substantially advanced any such legitimate public purpose.

"The regulatory actions of the city or any agency substantially advanc[e] a legitimate public purpose if the action bears a reasonable relationship to that objective.

"Now, if the preponderance of the evidence establishes that there was no reasonable relationship between the city's denial of the . . . proposal and legitimate public purpose, you should find in favor of the plaintiff. If you find that there existed a reasonable relationship between the city's decision and a legitimate public purpose, you should find in favor of the city. As long as the regulatory action by the city substantially advances their legitimate public purpose, . . . its underlying motives and reasons are not to be inquired into." *Id.*, at 304.

The essence of these instructions was proposed by the city. See Tr. 11 (June 17, 1994).

The jury delivered a general verdict for Del Monte Dunes on its takings claim, a separate verdict for Del Monte Dunes on its equal protection claim, and a damages award of $1.45 million. Tr. 2 (Feb. 17, 1994). After the jury's verdict, the District Court ruled for the city on the substantive due process claim, stating that its ruling was not inconsistent with the jury's verdict on the equal protection or the takings claim. App. to Pet. for Cert. A–39. The court later denied the city's motions for a new trial or for judgment as a matter of law.

The Court of Appeals affirmed. 95 F. 3d 1422 (CA9 1996). The court first ruled that the District Court did not err in allowing Del Monte Dunes' regulatory takings claim to be tried to a jury, *id.*, at 1428, because Del Monte Dunes had a right to a jury trial under § 1983, *id.*, at 1426–1427, and whether Del Monte Dunes had been denied all economically viable use of the property and whether the city's denial of the final proposal substantially advanced legitimate public interests were, on the facts of this case, questions suitable for the jury, *id.*, at 1430. The court ruled that sufficient evidence had been presented to the jury from which it reason-

ably could have decided each of these questions in Del Monte Dunes' favor. *Id.*, at 1430–1434. Because upholding the verdict on the regulatory takings claim was sufficient to support the award of damages, the court did not address the equal protection claim. *Id.*, at 1426.

The questions presented in the city's petition for certiorari were (1) whether issues of liability were properly submitted to the jury on Del Monte Dunes' regulatory takings claim, (2) whether the Court of Appeals impermissibly based its decision on a standard that allowed the jury to reweigh the reasonableness of the city's land-use decision, and (3) whether the Court of Appeals erred in assuming that the rough-proportionality standard of *Dolan* v. *City of Tigard*, 512 U. S. 374 (1994), applied to this case. We granted certiorari, 523 U. S. 1045 (1998), and now address these questions in reverse order.

## II

In the course of holding a reasonable jury could have found the city's denial of the final proposal not substantially related to legitimate public interests, the Court of Appeals stated: "Even if the City had a legitimate interest in denying Del Monte's development application, its action must be 'roughly proportional' to furthering that interest. . . . That is, the City's denial must be related 'both in nature and extent to the impact of the proposed development.'" 95 F. 3d, at 1430, quoting *Dolan, supra*, at 391.

Although in a general sense concerns for proportionality animate the Takings Clause, see *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960) ("The Fifth Amendment's guarantee . . . was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole"), we have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions—land-use decisions conditioning approval of development on the dedication of property to public use. See *Dolan, supra*, at 385; *Nollan* v. *Cali-*

*fornia Coastal Comm'n,* 483 U. S. 825, 841 (1987). The rule applied in *Dolan* considers whether dedications demanded as conditions of development are proportional to the development's anticipated impacts. It was not designed to address, and is not readily applicable to, the much different questions arising where, as here, the landowner's challenge is based not on excessive exactions but on denial of development. We believe, accordingly, that the rough-proportionality test of *Dolan* is inapposite to a case such as this one.

The instructions given to the jury, however, did not mention proportionality, let alone require it to find for Del Monte Dunes unless the city's actions were roughly proportional to its asserted interests. The Court of Appeals' discussion of rough proportionality, we conclude, was unnecessary to its decision to sustain the jury's verdict. Although the court stated that "[s]ignificant evidence supports Del Monte's claim that the City's actions were disproportional to both the nature and extent of the impact of the proposed development," 95 F. 3d, at 1432, it did so only after holding that

> "Del Monte provided evidence sufficient to rebut each of these reasons [for denying the final proposal]. Taken together, Del Monte argued that the City's reasons for denying their application were invalid and that it unfairly intended to forestall any reasonable development of the Dunes. In light of the evidence proffered by Del Monte, the City has incorrectly argued that no rational juror could conclude that the City's denial of Del Monte's application lacked a sufficient nexus with its stated objectives." *Id.,* at 1431–1432.

Given this holding, it was unnecessary for the Court of Appeals to discuss rough proportionality. That it did so is irrelevant to our disposition of the case.

### III

The city challenges the Court of Appeals' holding that the jury could have found the city's denial of the final develop-

ment plan not reasonably related to legitimate public interests. Although somewhat obscure, the city's argument is not cast as a challenge to the sufficiency of the evidence; rather, the city maintains that the Court of Appeals adopted a legal standard for regulatory takings liability that allows juries to second-guess public land-use policy.

As the city itself proposed the essence of the instructions given to the jury, it cannot now contend that the instructions did not provide an accurate statement of the law. In any event, although this Court has provided neither a definitive statement of the elements of a claim for a temporary regulatory taking nor a thorough explanation of the nature or applicability of the requirement that a regulation substantially advance legitimate public interests outside the context of required dedications or exactions, cf., *e. g., Nollan, supra,* at 834–835, n. 3, we note that the trial court's instructions are consistent with our previous general discussions of regulatory takings liability. See *Dolan, supra,* at 385; *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003, 1016 (1992); *Yee* v. *Escondido,* 503 U. S. 519, 534 (1992); *Nollan, supra,* at 834; *Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U. S. 470, 485 (1987); *United States* v. *Riverside Bayview Homes, Inc.,* 474 U. S. 121, 126 (1985); *Agins* v. *City of Tiburon,* 447 U. S. 255, 260 (1980). The city did not challenge below the applicability or continued viability of the general test for regulatory takings liability recited by these authorities and upon which the jury instructions appear to have been modeled. Given the posture of the case before us, we decline the suggestions of *amici* to revisit these precedents.

To the extent the city contends the judgment sustained by the Court of Appeals was based upon a jury determination of the reasonableness of its general zoning laws or land-use policies, its argument can be squared with neither the instructions given to the jury nor the theory on which the case was tried. The instructions did not ask the jury whether the city's zoning ordinances or policies were unreasonable

but only whether "the city's decision to reject the plaintiff's 190 unit development proposal did not substantially advance a legitimate public purpose," App. 303, that is, whether "there was no reasonable relationship between the city's denial of the . . . proposal and legitimate public purpose," *id.*, at 304. Furthermore, Del Monte Dunes' lawyers were explicit in conceding that "[t]his case is not about the right of a city, in this case the city of Monterey, to regulate land." 10 Tr. 1286 (Feb. 9, 1994). See also *id.*, at 1287 (proposals were made "keeping in mind various regulations and requirements, heights, setbacks, and densities and all that. That's not what this case is about"); *id.*, at 1287–1288 ("They have the right to set height limits. They have the right to talk about where they want access. That's not what this case is about. We all accept that in today's society, cities and counties can tell a land owner what to do to some reasonable extent with their property"). Though not presented for review, Del Monte Dunes' equal protection argument that it had received treatment inconsistent with zoning decisions made in favor of owners of similar properties, and the jury's verdict for Del Monte Dunes on this claim, confirm the understanding of the jury and Del Monte Dunes that the complaint was not about general laws or ordinances but about a particular zoning decision.

The instructions regarding the city's decision also did not allow the jury to consider the reasonableness, *per se*, of the customized, ad hoc conditions imposed on the property's development, and Del Monte Dunes did not suggest otherwise. On the contrary, Del Monte Dunes disclaimed this theory of the case in express terms: "Del Monte Dunes partnership did not file this lawsuit because they were complaining about giving the public the beach, keeping it [the development] out of the view shed, devoting and [giving] to the State all this habitat area. One-third [of the] property is going to be given away for the public use forever. That's not what we filed the lawsuit about." *Id.*, at 1288; see also *id.*, at 1288–

1289 (conceding that the city may "ask an owner to give away a third of the property without getting a dime in compensation for it and providing parking lots for the public and habitats for the butterfly, and boardwalks").

Rather, the jury was instructed to consider whether the city's denial of the final proposal was reasonably related to a legitimate public purpose. Even with regard to this issue, however, the jury was not given free rein to second-guess the city's land-use policies. Rather, the jury was instructed, in unmistakable terms, that the various purposes asserted by the city were legitimate public interests. See App. 304.

The jury, furthermore, was not asked to evaluate the city's decision in isolation but rather in context, and, in particular, in light of the tortuous and protracted history of attempts to develop the property. See, e. g., 10 Tr. 1294–1295 (Feb. 9, 1994). Although Del Monte Dunes was allowed to introduce evidence challenging the asserted factual bases for the city's decision, it also highlighted the shifting nature of the city's demands and the inconsistency of its decision with the recommendation of its professional staff, as well as with its previous decisions. See, e. g., id., at 1300. Del Monte Dunes also introduced evidence of the city's longstanding interest in acquiring the property for public use. See, e. g., id., at 1303–1306.

In short, the question submitted to the jury on this issue was confined to whether, in light of all the history and the context of the case, the city's particular decision to deny Del Monte Dunes' final development proposal was reasonably related to the city's proffered justifications. This question was couched, moreover, in an instruction that had been proposed in essence by the city, and as to which the city made no objection.

Thus, despite the protests of the city and its *amici*, it is clear that the Court of Appeals did not adopt a rule of takings law allowing wholesale interference by judge or jury with municipal land-use policies, laws, or routine regulatory

decisions. To the extent the city argues that, as a matter of law, its land-use decisions are immune from judicial scrutiny under all circumstances, its position is contrary to settled regulatory takings principles. We reject this claim of error.

## IV

We next address whether it was proper for the District Court to submit the question of liability on Del Monte Dunes' regulatory takings claim to the jury. (Before the District Court, the city agreed it was proper for the jury to assess damages. See Supplemental Memorandum of Petitioner Re: Court/Jury Trial Issues in No. C86–5042 (ND Cal.), p. 2, Record, Doc. No. 111.) As the Court of Appeals recognized, the answer depends on whether Del Monte Dunes had a statutory or constitutional right to a jury trial, and, if it did, the nature and extent of the right. Del Monte Dunes asserts the right to a jury trial is conferred by § 1983 and by the Seventh Amendment.

Under our precedents, "[b]efore inquiring into the applicability of the Seventh Amendment, we must 'first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided.'" *Feltner* v. *Columbia Pictures Television, Inc.*, 523 U. S. 340, 345 (1998) (quoting *Tull* v. *United States*, 481 U. S. 412, 417, n. 3 (1987)); accord, *Curtis* v. *Loether*, 415 U. S. 189, 192, n. 6 (1974).

The character of § 1983 is vital to our Seventh Amendment analysis, but the statute does not itself confer the jury right. See *Feltner, supra,* at 345 ("[W]e cannot discern 'any congressional intent to grant . . . the right to a jury trial'" (quoting *Tull, supra,* at 417, n. 3)). Section 1983 authorizes a party who has been deprived of a federal right under the color of state law to seek relief through "an action at law, suit in equity, or other proper proceeding for redress." Del Monte Dunes contends that the phrase "action at law" is a

term of art implying a right to a jury trial. We disagree, for this is not a necessary implication.

In *Lorillard* v. *Pons*, 434 U. S. 575, 583 (1978), we found a statutory right to a jury trial in part because the statute authorized "*legal* . . . relief*." Our decision, however, did not rest solely on the statute's use of the phrase but relied as well on the statute's explicit incorporation of the procedures of the Fair Labor Standards Act, which had been interpreted to guarantee trial by jury in private actions. *Id.*, at 580. We decline, accordingly, to find a statutory jury right under § 1983 based solely on the authorization of "an action at law."

As a consequence, we must reach the constitutional question. The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." Consistent with the textual mandate that the jury right be preserved, our interpretation of the Amendment has been guided by historical analysis comprising two principal inquiries. "[W]e ask, first, whether we are dealing with a cause of action that either was tried at law at the time of the founding or is at least analogous to one that was." *Markman* v. *Westview Instruments, Inc.*, 517 U. S. 370, 376 (1996). "If the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791." *Ibid.*

A

With respect to the first inquiry, we have recognized that "suits at common law" include "not merely suits, which the *common* law recognized among its old and settled proceedings, but [also] suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Parsons* v. *Bedford*, 3 Pet. 433, 447 (1830). The Seventh Amendment thus applies not only

to common-law causes of action but also to statutory causes of action "'analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty.'" *Feltner, supra,* at 348 (quoting *Granfinanciera, S. A.* v. *Nordberg,* 492 U. S. 33, 42 (1989)); accord, *Curtis, supra,* at 193.

1

Del Monte Dunes brought this suit pursuant to § 1983 to vindicate its constitutional rights. We hold that a § 1983 suit seeking legal relief is an action at law within the meaning of the Seventh Amendment. JUSTICE SCALIA's opinion concurring in part and concurring in the judgment presents a comprehensive and convincing analysis of the historical and constitutional reasons for this conclusion. We agree with his analysis and conclusion.

It is undisputed that when the Seventh Amendment was adopted there was no action equivalent to § 1983, framed in specific terms for vindicating constitutional rights. It is settled law, however, that the Seventh Amendment jury guarantee extends to statutory claims unknown to the common law, so long as the claims can be said to "soun[d] basically in tort," and seek legal relief. *Curtis, supra,* at 195–196.

As JUSTICE SCALIA explains, see *post,* at 727–731, there can be no doubt that claims brought pursuant to § 1983 sound in tort. Just as common-law tort actions provide redress for interference with protected personal or property interests, § 1983 provides relief for invasions of rights protected under federal law. Recognizing the essential character of the statute, "'[w]e have repeatedly noted that 42 U. S. C. § 1983 creates a species of tort liability,'" *Heck* v. *Humphrey,* 512 U. S. 477, 483 (1994) (quoting *Memphis Community School Dist.* v. *Stachura,* 477 U. S. 299, 305 (1986)), and have interpreted the statute in light of the "background of tort liability," *Monroe* v. *Pape,* 365 U. S. 167, 187 (1961) (overruled on other grounds, *Monell* v. *New York City Dept. of Social Servs.,* 436

U. S. 658 (1978)); accord, *Heck, supra,* at 483. Our settled understanding of § 1983 and the Seventh Amendment thus compel the conclusion that a suit for legal relief brought under the statute is an action at law.

Here Del Monte Dunes sought legal relief. It was entitled to proceed in federal court under § 1983 because, at the time of the city's actions, the State of California did not provide a compensatory remedy for temporary regulatory takings. See *First English,* 482 U. S., at 308–311. The constitutional injury alleged, therefore, is not that property was taken but that it was taken without just compensation. Had the city paid for the property or had an adequate postdeprivation remedy been available, Del Monte Dunes would have suffered no constitutional injury from the taking alone. See *Williamson,* 473 U. S., at 194–195. Because its statutory action did not accrue until it was denied just compensation, in a strict sense Del Monte Dunes sought not just compensation *per se* but rather damages for the unconstitutional denial of such compensation. Damages for a constitutional violation are a legal remedy. See, *e. g., Teamsters* v. *Terry,* 494 U. S. 558, 570 (1990) ("Generally, an action for money damages was 'the traditional form of relief offered in the courts of law'") (quoting *Curtis,* 415 U. S., at 196).

Even when viewed as a simple suit for just compensation, we believe Del Monte Dunes' action sought essentially legal relief. "We have recognized the 'general rule' that monetary relief is legal." *Feltner,* 523 U. S., at 352 (quoting *Teamsters* v. *Terry, supra,* at 570). Just compensation, moreover, differs from equitable restitution and other monetary remedies available in equity, for in determining just compensation, "the question is what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce* v. *Boston,* 217 U. S. 189, 195 (1910). As its name suggests, then, just compensation is, like ordinary money damages, a compensatory remedy. The Court has recognized that compensation is a purpose "traditionally associated with legal

relief." *Feltner, supra,* at 352. Because Del Monte Dunes' statutory suit sounded in tort and sought legal relief, it was an action at law.

2

In an attempt to avoid the force of this conclusion, the city urges us to look not to the statutory basis of Del Monte Dunes' claim but rather to the underlying constitutional right asserted. At the very least, the city asks us to create an exception to the general Seventh Amendment rule governing § 1983 actions for claims alleging violations of the Takings Clause of the Fifth Amendment. See *New Port Largo, Inc.* v. *Monroe County,* 95 F. 3d 1084 (CA11 1996) (finding, in tension with the Ninth Circuit's decision in this case, that there is no right to a jury trial on a takings claim brought under § 1983). Because the jury's role in estimating just compensation in condemnation proceedings was inconsistent and unclear at the time the Seventh Amendment was adopted, this Court has said "that there is no constitutional right to a jury in eminent domain proceedings." *United States* v. *Reynolds,* 397 U. S. 14, 18 (1970); accord, *Bauman* v. *Ross,* 167 U. S. 548, 593 (1897). The city submits that the analogy to formal condemnation proceedings is controlling, so that there is no jury right here.

As JUSTICE SCALIA notes, see *post,* at 724–726, we have declined in other contexts to classify § 1983 actions based on the nature of the underlying right asserted, and the city provides no persuasive justification for adopting a different rule for Seventh Amendment purposes. Even when analyzed not as a § 1983 action *simpliciter,* however, but as a § 1983 action seeking redress for an uncompensated taking, Del Monte Dunes' suit remains an action at law.

Although condemnation proceedings spring from the same Fifth Amendment right to compensation which, as incorporated by the Fourteenth Amendment, is applicable here, see *First English, supra,* at 315 (citing *Jacobs* v. *United States,* 290 U. S. 13, 16 (1933)), a condemnation action differs in im-

portant respects from a § 1983 action to redress an uncompensated taking. Most important, when the government initiates condemnation proceedings, it concedes the landowner's right to receive just compensation and seeks a mere determination of the amount of compensation due. Liability simply is not an issue. As a result, even if condemnation proceedings were an appropriate analogy, condemnation practice would provide little guidance on the specific question whether Del Monte Dunes was entitled to a jury determination of liability.

This difference renders the analogy to condemnation proceedings not only unhelpful but also inapposite. When the government takes property without initiating condemnation proceedings, it "shifts to the landowner the burden to discover the encroachment and to take affirmative action to recover just compensation." *United States* v. *Clarke,* 445 U. S. 253, 257 (1980). Even when the government does not dispute its seizure of the property or its obligation to pay for it, the mere "shifting of the initiative from the condemning authority to the condemnee" can place the landowner "at a significant disadvantage." *Id.,* at 258; cf. *id.,* at 255 ("There are important legal and practical differences between an inverse condemnation suit and a condemnation proceeding"); 84 Stat. 1906, § 304, 42 U. S. C. § 4654 (recognizing, at least implicitly, the added burden by providing for recovery of attorney's fees in cases where the government seizes property without initiating condemnation proceedings but not in ordinary condemnation cases). Where, as here, the government not only denies liability but fails to provide an adequate post-deprivation remedy (thus refusing to submit the question of liability to an impartial arbiter), the disadvantage to the owner becomes all the greater. At least in these circumstances, the analogy to ordinary condemnation procedures is simply untenable.

Our conclusion is confirmed by precedent. Early authority finding no jury right in a condemnation proceeding did so

on the ground that condemnation did not involve the determination of legal rights because liability was undisputed:

> "We are therefore of opinion that the trial by jury is preserved inviolate in the sense of the constitution, when in all criminal cases, and in civil cases when a right is in controversy in a court of law, it is secured to each party. In cases of this description [condemnation proceedings], the right to take, and the right to compensation, are admitted; the only question is the amount, which may be submitted to any impartial tribunal the legislature may designate." *Bonaparte* v. *Camden & Amboy R. Co.*, 3 F. Cas. 821, 829 (No. 1,617) (CC NJ 1830) (Baldwin, Circuit Justice).

(Although JUSTICE SOUTER's opinion concurring in part and dissenting in part takes issue with this distinction, its arguments are unpersuasive. First, it correctly notes that when the government initiates formal condemnation procedures, a landowner may question whether the proposed taking is for public use. The landowner who raises this issue, however, seeks not to establish the government's liability for damages, but to prevent the government from taking his property at all. As the dissent recognizes, the relief desired by a landowner making this contention is analogous not to damages but to an injunction; it should be no surprise, then, that the landowner is not entitled to a jury trial on his entitlement to a remedy that sounds not in law but in equity. Second, the dissent refers to "the diversity of rationales underlying early state cases in which the right of a direct condemnee to a jury trial was considered and denied." *Post*, at 742. The dissent mentions only the rationale that because the government is immune from suit for damages, it can qualify any remedy it provides by dispensing with the right to a jury trial. The cases cited for this proposition—two state-court cases antedating the adoption of the Fourteenth Amendment and an off-point federal case—do not implicate

the Fifth Amendment. Even if the sovereign immunity rationale retains its vitality in cases where this Amendment is applicable, cf. *First English*, 482 U. S., at 316, n. 9, it is neither limited to nor coextensive with takings claims. Rather, it would apply to all constitutional suits against the Federal Government or the States, but not to constitutional suits such as this one against municipalities like the city of Monterey. Third, the dissent contends that the distinction we have drawn is absent from our condemnation cases. Even if this were true—and it is not obvious that it is—equally absent from those decisions is any analysis or principle that would extend beyond the narrow context of direct condemnation suits to actions such as this one. Rather, as apparent even from the passages quoted by the dissent, see *post*, at 736–739, and n. 1, these cases rely only on the Court's perception of historical English and colonial practice in direct condemnation cases. Nothing in these cases detracts from the authorities cited in this opinion that do support the distinction we draw between direct condemnation and a suit like this one. Finally, the existence of a different historical practice distinguishes direct condemnation from an ordinary tort case in which the defendant concedes liability. See *post*, at 742–743, n. 5.)

Condemnation proceedings differ from the instant cause of action in another fundamental respect as well. When the government condemns property for public use, it provides the landowner a forum for seeking just compensation, as is required by the Constitution. See *First English, supra*, at 316. If the condemnation proceedings do not, in fact, deny the landowner just compensation, the government's actions are neither unconstitutional nor unlawful. See *Williamson*, 473 U. S., at 194 ("The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation"). Even when the government takes property without initiating condemnation proceedings, there is no constitutional violation " 'unless or until the state fails to pro-

vide an adequate postdeprivation remedy for the property loss.'" *Id.*, at 195 (quoting *Hudson* v. *Palmer*, 468 U. S. 517, 532, n. 12 (1984)). In this case, however, Del Monte Dunes was denied not only its property but also just compensation or even an adequate forum for seeking it. That is the gravamen of the § 1983 claim.

In these circumstances, we conclude the cause of action sounds in tort and is most analogous to the various actions that lay at common law to recover damages for interference with property interests. Our conclusion is consistent with the original understanding of the Takings Clause and with historical practice.

Early opinions, nearly contemporaneous with the adoption of the Bill of Rights, suggested that when the government took property but failed to provide a means for obtaining just compensation, an action to recover damages for the government's actions would sound in tort. See, *e. g.*, *Lindsay* v. *Commissioners*, 2 Bay 38, 61 (S. C. 1796) (opinion of Waties, J.) ("But suppose they could sue, what would be the nature of the action? It could not be founded on contract, for there was none. It must then be on a *tort*; it must be an action of trespass, in which the jury would give a reparation *in damages*. Is not this acknowledging that the act of the legislature [in authorizing uncompensated takings] is a tortious act?" (emphases in original)); *Gardner* v. *Village of Newburgh*, 2 Johns. Ch. 162, 164, 166 (N. Y. 1816) (Kent, Ch.) (uncompensated governmental interference with property right would support a tort action at law for nuisance).

Consistent with this understanding, and as a matter of historical practice, when the government has taken property without providing an adequate means for obtaining redress, suits to recover just compensation have been framed as common-law tort actions. See, *e. g.*, *Richards* v. *Washington Terminal Co.*, 233 U. S. 546 (1914) (nuisance); *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166 (1872) (trespass on the case); *Barron ex rel. Tiernan* v. *Mayor of Baltimore*, 7 Pet. 243

(1833) (unspecified tort); *Bradshaw* v. *Rodgers,* 20 Johns. 103 (N. Y. 1822) (trespass). Tort actions of these descriptions lay at common law, 3 W. Blackstone, Commentaries on the Laws of England, ch. 12 (1768) (trespass; trespass on the case); *id.,* ch. 13 (trespass on the case for nuisance), and in these actions, as in other suits at common law, there was a right to trial by jury, see, *e. g., Feltner,* 523 U. S., at 349 ("Actions on the case, like other actions at law, were tried before juries").

(JUSTICE SOUTER's criticism of our reliance on these early authorities misses the point of our analysis. We do not contend that the landowners were always successful. As the dissent makes clear, prior to the adoption of the Fourteenth Amendment and the concomitant incorporation of the Takings Clause against the States, a variety of obstacles—including various traditional immunities, the lack of a constitutional right, and the resulting possibility of legislative justification—stood in the way of the landowner who sought redress for an uncompensated taking. Rather, our point is that the suits were attempted and were understood to sound in tort. It is therefore ironic that the dissent invokes a law review article discussing such suits entitled "The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law." *Post,* at 746–747 (citing Brauneis, 52 Vand. L. Rev. 57 (1999)). It is true, as the dissenting opinion observes, that claims for just compensation were sometimes brought in quasi contract rather than tort. See, *e. g., United States* v. *Lynah,* 188 U. S. 445, 458–465 (1903) (overruled on other grounds, *United States* v. *Chicago, M., St. P. & P. R. Co.,* 312 U. S. 592 (1941)) (comparing claims for just compensation brought in quasi contract with just-compensation claims brought in tort). The historical existence of quasi-contract suits for just compensation does nothing to undermine our Seventh Amendment analysis, however, since quasi contract was frequently available to the victim of a tort who elected to waive the tort and proceed

instead in quasi contract. See, *e. g.*, W. Prosser, Law of Torts § 110, pp. 1118–1127 (1941). In any event, quasi contract was itself an action at law. See, *e. g.*, 1 G. Palmer, Restitution §§ 1.2, 2.2–2.3 (1978); F. Woodward, Quasi Contracts § 6 (1913).)

The city argues that because the Constitution allows the government to take property for public use, a taking for that purpose cannot be tortious or unlawful. We reject this conclusion. Although the government acts lawfully when, pursuant to proper authorization, it takes property and provides just compensation, the government's action is lawful solely because it assumes a duty, imposed by the Constitution, to provide just compensation. See *First English*, 482 U. S., at 315 (citing *Jacobs*, 290 U. S., at 16). When the government repudiates this duty, either by denying just compensation in fact or by refusing to provide procedures through which compensation may be sought, it violates the Constitution. In those circumstances the government's actions are not only unconstitutional but unlawful and tortious as well. See *Gardner* v. *Village of Newburgh, supra*, at 166, 168 ("[T]o render the exercise of the [eminent domain] power valid," the government must provide landowner "fair compensation"; "[u]ntil, then, some provision be made for affording him compensation, it would be unjust, and contrary to the first principles of government," to deprive plaintiff of his property rights; absent such a provision, the plaintiff "would be entitled to his action at law for the interruption of his right"); *Beatty* v. *United States*, 203 F. 620, 626 (CA4 1913) ("The taking of property by condemnation under the power of eminent domain is compulsory. The party is deprived of his property against his will. It is in effect a lawful trespass committed by the sovereign, and lawful only on the condition that the damages inflicted by the trespass are paid to the injured party. The analogy to a suit at common law for trespass is close and complete").

(The argument that an uncompensated taking is not tortious because the landowner seeks just compensation rather than additional damages for the deprivation of a remedy reveals the same misunderstanding. Simply put, there is no constitutional or tortious injury until the landowner is denied just compensation. That the damages to which the landowner is entitled for this injury are measured by the just compensation he has been denied is neither surprising nor significant.)

## B

Having decided Del Monte Dunes' § 1983 suit was an action at law, we must determine whether the particular issues of liability were proper for determination by the jury. See *Markman* v. *Westview Instruments, Inc.*, 517 U. S. 370 (1996). In actions at law, issues that are proper for the jury must be submitted to it "to preserve the right to a jury's resolution of the ultimate dispute," as guaranteed by the Seventh Amendment. *Id.*, at 377. We determine whether issues are proper for the jury, when possible, "by using the historical method, much as we do in characterizing the suits and actions within which [the issues] arise." *Id.*, at 378. We look to history to determine whether the particular issues, or analogous ones, were decided by judge or by jury in suits at common law at the time the Seventh Amendment was adopted. Where history does not provide a clear answer, we look to precedent and functional considerations. *Id.*, at 384.

## 1

Just as no exact analogue of Del Monte Dunes' § 1983 suit can be identified at common law, so also can we find no precise analogue for the specific test of liability submitted to the jury in this case. We do know that in suits sounding in tort for money damages, questions of liability were decided by the jury, rather than the judge, in most cases. This allocation preserved the jury's role in resolving what was often

the heart of the dispute between plaintiff and defendant. Although these general observations provide some guidance on the proper allocation between judge and jury of the liability issues in this case, they do not establish a definitive answer.

2

We look next to our existing precedents. Although this Court has decided many regulatory takings cases, none of our decisions has addressed the proper allocation of liability determinations between judge and jury in explicit terms. This is not surprising. Most of our regulatory takings decisions have reviewed suits against the United States, see, *e. g., United States* v. *Riverside Bayview Homes, Inc.,* 474 U. S. 121 (1985); *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S. 264 (1981), suits decided by state courts, see, *e. g., Dolan* v. *City of Tigard,* 512 U. S. 374 (1994); *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003 (1992); *Nollan* v. *California Coastal Comm'n,* 483 U. S. 825 (1987); *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles,* 482 U. S. 304 (1987), or suits seeking only injunctive relief, see, *e. g., Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U. S. 470 (1987). It is settled law that the Seventh Amendment does not apply in these contexts. *Lehman* v. *Nakshian,* 453 U. S. 156, 160 (1981) (suits against the United States); *Curtis,* 415 U. S., at 192, n. 6 (suits brought in state court); *Parsons,* 3 Pet., at 447 (suits seeking only equitable relief).

In *Williamson,* we did review a regulatory takings case in which the plaintiff landowner sued a county planning commission in federal court for money damages under § 1983. 473 U. S., at 182. Whether the commission had denied the plaintiff all economically viable use of the property had been submitted to the jury. *Id.,* at 191–192, and n. 12. Although the Court did not consider the point, it assumed the propriety of this procedure. *E. g., id.,* at 191 ("It is not clear whether the jury would have found that the respondent had

been denied all reasonable beneficial use of the property had any of the eight objections been met through the grant of a variance. . . . Accordingly, until the Commission determines that no variances will be granted, it is impossible for the jury to find, on this record, whether respondent 'will be unable to derive economic benefit' from the land").

*Williamson* is not a direct holding, however, and we must look for further guidance. We turn next to considerations of process and function.

3

In actions at law predominantly factual issues are in most cases allocated to the jury. See *Baltimore & Carolina Line, Inc.* v. *Redman,* 295 U. S. 654, 657 (1935). The allocation rests on a firm historical foundation, see, *e. g.,* 1 E. Coke, Institutes 155b (1628) *("ad quaestionem facti non respondent judices; ad quaestionem juris non respondent juratores"),* and serves "to preserve the right to a jury's resolution of the ultimate dispute," *Markman, supra,* at 377.

Almost from the inception of our regulatory takings doctrine, we have held that whether a regulation of property goes so far that "there must be an exercise of eminent domain and compensation to sustain the act . . . depends upon the particular facts." *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 413 (1922); accord, *Keystone Bituminous Coal, supra,* at 473–474. Consistent with this understanding, we have described determinations of liability in regulatory takings cases as " 'essentially ad hoc, factual inquiries,' " *Lucas, supra,* at 1015 (quoting *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104, 124 (1978)), requiring "complex factual assessments of the purposes and economic effects of government actions," *Yee,* 503 U. S., at 523.

In accordance with these pronouncements, we hold that the issue whether a landowner has been deprived of all economically viable use of his property is a predominantly factual question. As our implied acknowledgment of the procedure in *Williamson, supra,* suggests, in actions at law

otherwise within the purview of the Seventh Amendment, this question is for the jury.

The jury's role in determining whether a land-use decision substantially advances legitimate public interests within the meaning of our regulatory takings doctrine presents a more difficult question. Although our cases make clear that this inquiry involves an essential factual component, see *Yee*, *supra*, at 523, it no doubt has a legal aspect as well, and is probably best understood as a mixed question of fact and law.

In this case, the narrow question submitted to the jury was whether, when viewed in light of the context and protracted history of the development application process, the city's decision to reject a particular development plan bore a reasonable relationship to its proffered justifications. See Part III, *supra*. As the Court of Appeals recognized, this question was "essentially fact-bound [in] nature." 95 F. 3d, at 1430 (internal quotation marks omitted) (alteration by Court of Appeals). Under these circumstances, we hold that it was proper to submit this narrow, fact-bound question to the jury.

C

We note the limitations of our Seventh Amendment holding. We do not address the jury's role in an ordinary inverse condemnation suit. The action here was brought under § 1983, a context in which the jury's role in vindicating constitutional rights has long been recognized by the federal courts. A federal court, moreover, cannot entertain a takings claim under § 1983 unless or until the complaining landowner has been denied an adequate postdeprivation remedy. Even the State of California, where this suit arose, now provides a facially adequate procedure for obtaining just compensation for temporary takings such as this one. Our decision is also circumscribed in its conceptual reach. The posture of the case does not present an appropriate occasion to define with precision the elements of a temporary regulatory takings claim; although the city objected to submitting

issues of liability to the jury at all, it approved the instructions that were submitted to the jury and therefore has no basis to challenge them.

For these reasons, we do not attempt a precise demarcation of the respective provinces of judge and jury in determining whether a zoning decision substantially advances legitimate governmental interests. The city and its *amici* suggest that sustaining the judgment here will undermine the uniformity of the law and eviscerate state and local zoning authority by subjecting all land-use decisions to plenary, and potentially inconsistent, jury review. Our decision raises no such specter. Del Monte Dunes did not bring a broad challenge to the constitutionality of the city's general land-use ordinances or policies, and our holding does not extend to a challenge of that sort. In such a context, the determination whether the statutory purposes were legitimate, or whether the purposes, though legitimate, were furthered by the law or general policy, might well fall within the province of the judge. Nor was the gravamen of Del Monte Dunes' complaint even that the city's general regulations were unreasonable as applied to Del Monte Dunes' property; we do not address the proper trial allocation of the various questions that might arise in that context. Rather, to the extent Del Monte Dunes' challenge was premised on unreasonable governmental action, the theory argued and tried to the jury was that the city's denial of the final development permit was inconsistent not only with the city's general ordinances and policies but even with the shifting ad hoc restrictions previously imposed by the city. Del Monte Dunes' argument, in short, was not that the city had followed its zoning ordinances and policies but rather that it had not done so. As is often true in § 1983 actions, the disputed questions were whether the government had denied a constitutional right in acting outside the bounds of its authority, and, if so, the extent of any resulting damages. These were questions for the jury.

V

For the reasons stated, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I join all except Part IV–A–2 of JUSTICE KENNEDY's opinion. In my view, all § 1983 actions must be treated alike insofar as the Seventh Amendment right to jury trial is concerned; that right exists when monetary damages are sought; and the issues submitted to the jury in the present case were properly sent there.

I

Revised Stat. § 1979, 42 U. S. C. § 1983, creates a duty to refrain from interference with the federal rights of others, and provides money damages and injunctive relief for violation of that duty. Since the statute itself confers no right to jury trial, such a right is to be found, if at all, in the application to § 1983 of the Seventh Amendment, which guarantees a jury "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars." In determining whether a particular cause of action is a "[s]ui[t] at common law" within the meaning of this provision, we must examine whether it was tried at law in 1791 or is analogous to such a cause, see, *e. g., Granfinanciera, S. A.* v. *Nordberg,* 492 U. S. 33, 42 (1989), and whether it seeks relief that is legal or equitable in nature, see, *e. g., Tull* v. *United States,* 481 U. S. 412, 421 (1987).

The fundamental difference between my view of this case and JUSTICE SOUTER's is that I believe § 1983 establishes a unique, or at least distinctive, cause of action, in that the legal duty which is the basis for relief is ultimately defined not by the claim-creating statute itself, but by an extrinsic body of law to which the statute refers, namely, "federal

rights elsewhere conferred." *Baker* v. *McCollan,* 443 U. S. 137, 144, n. 3 (1979). In this respect § 1983 is, so to speak, a prism through which many different lights may pass. Unlike JUSTICE SOUTER, I believe that, in analyzing this cause of action for Seventh Amendment purposes, the proper focus is on the prism itself, not on the particular ray that happens to be passing through in the present case.

The Seventh Amendment inquiry looks first to the "nature of the statutory action." *Feltner* v. *Columbia Pictures Television, Inc.,* 523 U. S. 340, 348 (1998). The only "statutory action" here is a § 1983 suit. The question before us, therefore, is not what common-law action is most analogous to some generic suit seeking compensation for a Fifth Amendment taking, but what common-law action is most analogous *to a § 1983 claim.* The fact that the breach of duty which underlies the particular § 1983 claim at issue here—a Fifth Amendment takings violation—may give rise to *another* cause of action besides a § 1983 claim, namely, a so-called inverse condemnation suit, which is (according to Part IV-A-2 of JUSTICE KENNEDY's opinion) or is not (according to JUSTICE SOUTER's opinion) entitled to be tried before a jury, seems to me irrelevant. The central question remains whether a *§ 1983 suit* is entitled to a jury. The fortuitous existence of an inverse-condemnation cause of action is surely not essential to the existence of the § 1983 claim. Indeed, for almost all § 1983 claims arising out of constitutional violations, no alternative private cause of action *does* exist— which makes it practically useful, in addition to being theoretically sound, to focus on the prism instead of the refracted light.

This is exactly the approach we took in *Wilson* v. *Garcia,* 471 U. S. 261 (1985)—an opinion whose analysis is so precisely in point that it gives this case a distinct quality of *déjà vu. Wilson* required us to analogize § 1983 actions to common-law suits for a different purpose: not to determine applicability of the jury-trial right, but to identify the rele-

vant statute of limitations. Since no federal limitations period was provided, the Court had to apply 42 U. S. C. § 1988(a), which stated that, in the event a federal civil rights statute is "deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the [federal] courts in the trial and disposition of the cause . . . ." In applying this provision, the Court identified as one of the steps necessary for its analysis resolution of precisely the question I have been discussing here: "[W]e must . . . decide whether all § 1983 claims should be characterized in the same way, or whether they should be evaluated differently depending upon the varying factual circumstances and legal theories presented in each individual case." 471 U. S., at 268. The Court concluded (as I do here) that all § 1983 claims should be characterized in the same way. It said (as I have) that § 1983 was "a uniquely federal remedy," and that it is "the purest coincidence . . . when state statutes or the common law provide for equivalent remedies; any analogies to those causes of action are bound to be imperfect." *Id.*, at 271–272 (citations, footnotes, and internal quotation marks omitted). And the Court was affected (as I am here) by the practical difficulties of the other course, which it described as follows:

"Almost every § 1983 claim can be favorably analogized to more than one of the ancient common-law forms of action, each of which may be governed by a different statute of limitations. . . .

"A catalog of . . . constitutional claims that have been alleged under § 1983 would encompass numerous and diverse topics and subtopics: discrimination in public employment on the basis of race or the exercise of First Amendment rights, discharge or demotion without pro-

cedural due process, mistreatment of schoolchildren, deliberate indifference to the medical needs of prison inmates, the seizure of chattels without advance notice or sufficient opportunity to be heard—to identify only a few." *Id.*, at 272–273 (footnotes omitted).

For these reasons the Court concluded that *all* § 1983 actions should be characterized as "tort action[s] for the recovery of damages for personal injuries." *Id.*, at 276.

To be sure, § 1988 is not the Seventh Amendment. It is entirely possible to analogize § 1983 to the "common law" in one fashion for purposes of that statute, and in another fashion for purposes of the constitutional guarantee. But I cannot imagine why one would want to do that. For both purposes it is a "unique federal remedy" whose character is determined by the federal cause of action, and not by the innumerable constitutional and statutory violations upon which that cause of action is dependent. And for both purposes the search for (often nonexistent) common-law analogues to remedies for those particular violations is a major headache. Surely, the burden should be upon JUSTICE SOUTER to explain why a different approach is appropriate in the present context. I adhere to the approach of *Wilson*, reaffirmed and refined in *Owens* v. *Okure*, 488 U. S. 235 (1989), that a § 1983 action is a § 1983 action.[1]

---

[1] JUSTICE SOUTER properly notes that "trial by jury is not a uniform feature of § 1983 actions." *Post*, at 751. This does not lead, however, to his desired conclusion that all § 1983 actions can therefore not properly be analogized to tort claims. *Post*, at 740, 750–752. Before the merger of law and equity, a contested right would have to be established at law before relief could be obtained in equity. Thus, a suit in equity to enjoin an alleged nuisance could not be brought until a tort action at law established the right to relief. See 1 J. High, Law of Injunctions 476–477 (2d ed. 1880). Since the merger of law and equity, any type of relief, including purely equitable relief, can be sought in a tort suit—so that I can file a tort action seeking only an injunction against a nuisance. If I should do so, the fact that I seek only equitable relief would disentitle me to a jury, see, *e. g.*, *Curtis* v. *Loether*, 415 U. S. 189, 198 (1974); *Dairy Queen,*

## II

To apply this methodology to the present case: There is no doubt that the cause of action created by § 1983 is, and was always regarded as, a tort claim. Thomas Cooley's treatise on tort law, which was published roughly contemporaneously with the enactment of § 1983, tracked Blackstone's view, see 3 W. Blackstone, Commentaries on the Laws of England 115–119 (1768), that torts are remedies for invasions of certain rights, such as the rights to personal security, personal liberty, and property. T. Cooley, Law of Torts 2–3 (1880). Section 1983 assuredly fits that description. Like other tort causes of action, it is designed to provide compensation for injuries arising from the violation of legal duties, see *Carey* v. *Piphus*, 435 U. S. 247, 254 (1978), and thereby, of course, to deter future violations.

This Court has confirmed in countless cases that a § 1983 cause of action sounds in tort. We have stated repeatedly that § 1983 "creates a species of tort liability," *Imbler* v. *Pachtman*, 424 U. S. 409, 417 (1976); see also *Heck* v. *Humphrey*, 512 U. S. 477, 483 (1994); *Memphis Community School Dist.* v. *Stachura*, 477 U. S. 299, 305 (1986); *Smith* v. *Wade*, 461 U. S. 30, 34 (1983); *Carey, supra,* at 253; *Hague* v. *Committee for Industrial Organization*, 307 U. S. 496, 507 (1939) (opinion of Roberts, J.) (describing a claim brought under a predecessor of § 1983 as seeking relief for "tortious invasions of alleged civil rights by persons acting under color

---

*Inc.* v. *Wood*, 369 U. S. 469, 471 (1962); *Parsons* v. *Bedford*, 3 Pet. 433, 446–447 (1830); E. Re & J. Re, Cases and Materials on Remedies 46 (4th ed. 1996)—but that would not render the nuisance suit any less a *tort* suit, so that if damages *were* sought a jury *would* be required. So also here: Some § 1983 suits do not require a jury because only equitable relief is sought. But since they are *tort* suits, when damages are requested, as they are in the present case, a jury must be provided. Thus, the relief sought is an important consideration in the Seventh Amendment inquiry, but contrary to JUSTICE SOUTER's belief it is a consideration separate from the determination of the analogous common-law cause of action.

of state authority"). We have commonly described it as creating a "constitutional tort," since violations of constitutional rights have been the most frequently litigated claims. See *Crawford-El* v. *Britton*, 523 U. S. 574, 600–601 (1998); *Jefferson* v. *City of Tarrant*, 522 U. S. 75, 78–79 (1997); *McMillian* v. *Monroe County*, 520 U. S. 781, 784 (1997); *Richardson* v. *McKnight*, 521 U. S. 399, 401 (1997); *Johnson* v. *Jones*, 515 U. S. 304, 307 (1995); *Albright* v. *Oliver*, 510 U. S. 266, 269 (1994); *Siegert* v. *Gilley*, 500 U. S. 226, 231 (1991); *St. Louis* v. *Praprotnik*, 485 U. S. 112, 121 (1988); *Daniels* v. *Williams*, 474 U. S. 327, 329 (1986); *Memphis Community School Dist.*, *supra*, at 307; *Smith, supra*, at 35; *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 691 (1978). In *Wilson* v. *Garcia*, we explicitly identified § 1983 as a personal-injury tort, stating that "[a] violation of [§ 1983] is an injury to the individual rights of the person," and that "Congress unquestionably would have considered the remedies established in the Civil Rights Act [of 1871] to be more analogous to tort claims for personal injury than, for example, to claims for damages to property or breach of contract." 471 U. S., at 277.

As described earlier, in *Wilson, supra*, and *Okure, supra*, we used § 1983's identity as a personal-injury tort to determine the relevant statute of limitations under 42 U. S. C. § 1988(a). We have also used § 1983's character as a tort cause of action to determine the scope of immunity, *Kalina* v. *Fletcher*, 522 U. S. 118, 124–125 (1997), the recoverable damages, *Heck, supra*, at 483; *Memphis Community School Dist., supra*, at 305–306, and the scope of liability, *Monroe* v. *Pape*, 365 U. S. 167, 187 (1961). In *Owen* v. *Independence*, 445 U. S. 622, 657 (1980), we even asserted that the attributes of § 1983 could change to keep up with modern developments in the law of torts: "Doctrines of tort law have changed significantly over the past century, and our notions of governmental responsibility should properly reflect that evo-

lution. . . . [T]he principle of equitable loss-spreading has joined fault as a factor in distributing the costs of official misconduct."

The Seventh Amendment's right to jury trial attaches to a statutory cause of action that, although unknown at common law, is analogous to common-law causes that were tried before juries. See, *e. g.*, *Feltner* v. *Columbia Pictures Television, Inc.*, 523 U. S., at 347–348. The initial Seventh Amendment question before us, therefore, is whether a tort action seeking money damages was a "suit at common law" for which a jury trial was provided. The answer is obviously yes. Common-law tort actions were brought under the writs of trespass and trespass on the case. See generally S. Milsom, Historical Foundations of the Common Law 283–313 (2d ed. 1981). Trespass remedied direct, forcible tortious injuries, while the later developed trespass on the case remedied indirect or consequential harms. See, *e. g.*, Dix, Origins of the Action of Trespass on the Case, 46 Yale L. J. 1142, 1163 (1937); Krauss, Tort Law and Private Ordering, 35 St. Louis U. L. J. 623, 637, and n. 66 (1991). Claims brought pursuant to these writs and seeking money damages were triable to juries at common law. See, *e. g.*, T. Plucknett, A Concise History of the Common Law 125, 348 (4th ed. 1948); J. Baker, An Introduction to English Legal History 59 (2d ed. 1979). It is clear from our cases that a tort action for money damages is entitled to jury trial under the Seventh Amendment. See *Curtis* v. *Loether*, 415 U. S. 189, 195 (1974) (according jury trial because "[a] damages action under [Title VIII of the Civil Rights Act of 1968] sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach"); *Pernell* v. *Southall Realty*, 416 U. S. 363, 370 (1974) ("This Court has long assumed that . . . actions for damages to a person or property . . . are actions at law triable to a jury"); *Ross* v.

*Bernhard,* 396 U. S. 531, 533 (1970) ("The Seventh Amend-
ment . . . entitle[s] the parties to a jury trial in actions for
damages to a person or property . . .").

A number of lower courts have held that a § 1983 damages
action—without reference to what might have been the most
analogous common-law remedy for violation of the particular
federal right at issue—must be tried to a jury. See, *e. g.,*
*Caban-Wheeler* v. *Elsea,* 71 F. 3d 837, 844 (CA11 1996);
*Perez-Serrano* v. *DeLeon-Velez,* 868 F. 2d 30, 32–33 (CA1
1989); *Laskaris* v. *Thornburgh,* 733 F. 2d 260, 264 (CA3 1984);
*Segarra* v. *McDade,* 706 F. 2d 1301, 1304 (CA4 1983); *Dolence*
v. *Flynn,* 628 F. 2d 1280, 1282 (CA10 1980); *Amburgey* v.
*Cassady,* 507 F. 2d 728, 730 (CA6 1974); *Brisk* v. *Miami*
*Beach,* 726 F. Supp. 1305, 1311–1312 (SD Fla. 1989); *Ruth*
*Anne M.* v. *Alvin Independent School Dist.,* 532 F. Supp.
460, 475 (SD Tex. 1982); *Mason* v. *Melendez,* 525 F. Supp.
270, 282 (WD Wis. 1981); *Cook* v. *Cox,* 357 F. Supp. 120, 124–
125, and n. 4 (ED Va. 1973).

In sum, it seems to me entirely clear that a § 1983 cause of
action for damages is a tort action for which jury trial would
have been provided at common law. The right of jury trial
is not eliminated, of course, by virtue of the fact that, under
our modern unified system, the equitable relief of an injunc-
tion is also sought. See, *e. g., Dairy Queen, Inc.* v. *Wood,*
369 U. S. 469, 479 (1962); *Scott* v. *Neely,* 140 U. S. 106, 109–110
(1891). Nor—to revert to the point made in Part I of this
discussion—is the tort nature of the cause of action, and its
entitlement to jury trial, altered by the fact that another
cause of action was available (an inverse-condemnation suit)
to obtain the same relief. Even if that were an equitable
cause of action—or, as JUSTICE SOUTER asserts, a peculiar
legal cause of action to which the right to jury trial did not
attach—the nature of the § 1983 suit would no more be trans-
formed by it than, for example, a common-law fraud action
would be deprived of the right to jury trial by the fact that

the defendant was a trustee who could, instead, have been sued for an equitable accounting.

## III

To say that respondents had the right to a jury trial on their § 1983 claim is not to say that they were entitled to have the jury decide every issue. The precise scope of the jury's function is the second Seventh Amendment issue before us here—and there again, as we stated in *Markman* v. *Westview Instruments, Inc.*, 517 U. S. 370, 377 (1996), history is our guide. I agree with the Court's methodology, see *ante*, at 718–719, 720, which, in the absence of a precise historical analogue, recognizes the historical preference for juries to make primarily factual determinations and for judges to resolve legal questions. See *Baltimore & Carolina Line, Inc.* v. *Redman*, 295 U. S. 654, 657 (1935). That fact-law dichotomy is routinely applied by the lower courts in deciding § 1983 cases. For instance, in cases alleging retaliatory discharge of a public employee in violation of the First Amendment, judges determine whether the speech that motivated the termination was constitutionally protected speech, while juries find whether the discharge was caused by that speech. See, *e. g.*, *Horstkoetter* v. *Department of Public Safety*, 159 F. 3d 1265, 1271 (CA10 1998). And in cases asserting municipal liability for harm caused by unconstitutional policies, judges determine whether the alleged policies were unconstitutional, while juries find whether the policies in fact existed and whether they harmed the plaintiff. See, *e. g.*, *Myers* v. *County of Orange*, 157 F. 3d 66, 74–76 (CA2 1998), cert. denied, 525 U. S. 1146 (1999).

In the present case, the question of liability for a Takings Clause violation was given to the jury to determine by answering two questions: (1) whether respondents were deprived of "all economically viable use" of their property, and (2) whether petitioner's 1986 rejection of respondents' building plans "substantially advance[d] [a] legitimate public in-

teres[t]." *Ante,* at 701. I concur in the Court's assessment that the "economically viable use" issue presents primarily a question of fact appropriate for consideration by a jury. *Ante,* at 720–721. The second question—whether the taking "substantially advance[s] [a] legitimate public interes[t]"[2]— seems to me to break down (insofar as is relevant to the instructions here) into two subquestions: (1) Whether the government's asserted basis for its challenged action represents a legitimate state interest. That was a question of law for the court. (2) Whether that legitimate state interest is substantially furthered by the challenged government action. I agree with the Court that at least in the highly particularized context of the present case, involving the denial of a single application for stated reasons, that was a question of fact for the jury. As the matter was put to the jury in the present case, the first subquestion was properly removed from the jury's cognizance: the court instructed that "legitimate public interest[s] can include protecting the environment, preserving open space agriculture, protecting the health and safety of its citizens, and regulating the quality of the community by looking at development." App. 304. These included the only public interests asserted in the case. The second subquestion, on the other hand, was properly left to the jury: "[O]ne of your jobs as jurors is to decide if the city's decision here substantially advanced any such legitimate public purpose." *Ibid.;* see *ante,* at 721.

\*　　\*　　\*

I conclude that the Seventh Amendment provides respondents with a right to a jury trial on their § 1983 claim, and that the trial court properly submitted the particular issues raised by that § 1983 claim to the jury. For these reasons, I concur in the judgment and join all but Part IV–A–2 of JUSTICE KENNEDY's opinion.

---

[2] As the Court explains, petitioner forfeited any objection to this standard, see *ante,* at 704, and I express no view as to its propriety.

Justice Souter, with whom Justice O'Connor, Justice Ginsburg, and Justice Breyer join, concurring in part and dissenting in part.

A federal court commits error by submitting an issue to a jury over objection, unless the party seeking the jury determination has a right to a jury trial on the issue. Fed. Rule Civ. Proc. 39(a)(2). In this action under Rev. Stat. § 1979, 42 U. S. C. § 1983, the city unsuccessfully objected to submitting respondents' regulatory takings (or inverse condemnation) claim to a jury. Respondents had no right to a jury trial either by statute or under the Constitution; the District Court thus erred in submitting their claim to a jury. In holding to the contrary, that such a right does exist under the Seventh Amendment, the Court misconceives a takings claim under § 1983 and draws a false analogy between such a claim and a tort action. I respectfully dissent from this error.

I

I see eye to eye with the Court on some of the preliminary issues. I agree in rejecting extension of "rough proportionality" as a standard for reviewing land-use regulations generally and so join Parts I and II of the majority opinion. I also join the Court in thinking the statutory language "an action at law" insufficient to provide a jury right under 42 U. S. C. § 1983, *ante*, at 707–708, with the consequence that *Markman* v. *Westview Instruments, Inc.*, 517 U. S. 370 (1996), must provide the appropriate questions in passing on the issue of a constitutional guarantee of jury trial: "'whether we are dealing with a cause of action that either was tried at law at the time of the founding or is at least analogous to one that was'"; and, if so, "'whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791.'" *Ante*, at 708 (quoting *Markman*, *supra*, at 376). The Court soundly concedes that at the adoption of the Seventh Amendment there was no action like the modern in-

verse condemnation suit for obtaining just compensation when the government took property without invoking formal condemnation procedures. Like the Court, I am accordingly remitted to a search for any analogy that may exist and a consideration of any implication going to the substance of the jury right that the results of that enquiry may raise. But this common launching ground is where our agreement ends.

## II

The city's proposed analogy of inverse condemnation proceedings to direct ones is intuitively sensible, given their common Fifth Amendment constitutional source and link to the sovereign's power of eminent domain. Accord, *e. g., New Port Largo, Inc. v. Monroe County,* 95 F. 3d 1084, 1092 (CA11 1996) ("We have discovered no indication that the rule in regulatory takings cases differs from the general eminent domain framework"); *Northglenn v. Grynberg,* 846 P. 2d 175, 178 (Colo. 1993) ("Because an inverse condemnation action is based on the 'takings' clause of our constitution, it is to be tried as if it were an eminent domain proceeding"). See Grant, A Revolutionary View of the Seventh Amendment and the Just Compensation Clause, 91 Nw. U. L. Rev. 144, 191–205 (1996).

The intuition is borne out by closer analysis of the respective proceedings. The ultimate issue is identical in both direct and inverse condemnation actions: a determination of "the fair market value of the property [taken] on the date it is appropriated," as the measure of compensation required by the Fifth Amendment. *Kirby Forest Industries, Inc. v. United States,* 467 U. S. 1, 10 (1984). It follows, as Justice Brandeis said in *Hurley v. Kincaid,* 285 U. S. 95 (1932), that "[t]he compensation which [a property owner] may obtain in [an inverse condemnation] proceeding will be the same as that which he might have been awarded had the [government] instituted . . . condemnation proceedings," *id.,* at 104. This, indeed, has been our settled understanding, in cases

before *Hurley* and after *Kirby Forest Industries*, which have emphasized the common underlying nature of direct and inverse condemnation cases; the commencement of inverse condemnation actions by property owners, and direct condemnation proceedings by the government, does not go to the substance of either.   As we said in *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304 (1987):

> " 'The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners d[oes] not change the essential nature of the claim.   The form of the remedy did not qualify the right.   It rested upon the Fifth Amendment.' "   *Id.*, at 315 (quoting *Jacobs* v. *United States*, 290 U. S. 13, 16 (1933)).

Accord, *Boom Co.* v. *Patterson*, 98 U. S. 403, 407 (1879) ("The point in issue [in the inverse condemnation proceeding] was the compensation to be made to the owner of the land; in other words, the value of the property taken. . . . The case would have been in no essential particular different had the State authorized the company by statute to appropriate the particular property in question, and the owners to bring suit against the company in the courts of law for its value").   It is presumably for this reason that this Court has described inverse condemnation actions as it might speak of eminent domain proceedings brought by property owners instead of the government.   See *Agins* v. *City of Tiburon*, 447 U. S. 255, 258, n. 2 (1980) ("Inverse condemnation is 'a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted' ") (quoting *United States* v. *Clarke*, 445 U. S. 253, 257 (1980)).   See also *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960); Grant, *supra*, at 192–193 ("The difference between condemnation and inverse condemnation inheres precisely in the 'character' of

the former as *United States v. Landowner* and the latter as *Landowner v. United States*"). Thus, the analogy between direct and inverse condemnation is apparent whether we focus on the underlying Fifth Amendment right or the common remedy of just compensation.

The strength of the analogy is fatal to respondents' claim to a jury trial as a matter of right. Reaffirming what was already a well-established principle, the Court explained over a century ago that "the estimate of the just compensation for property taken for the public use, under the right of eminent domain, is not required to be made by a jury," *Bauman v. Ross*, 167 U. S. 548, 593 (1897) (citing, *inter alia, Custiss v. Georgetown & Alexandria Turnpike Co.*, 6 Cranch 233 (1810); *United States v. Jones*, 109 U. S. 513, 519 (1883); and *Shoemaker v. United States*, 147 U. S. 282, 300, 301 (1893)),[1]

---

[1] In *Bauman*, the Court upheld a statute (providing for condemnation of land for streets) that contemplated a form of jury "differing from an ordinary jury in consisting of less than twelve persons, and in not being required to act with unanimity," and stated that the just compensation determination "may be entrusted by Congress to commissioners appointed by a court or by the executive, or to an inquest consisting of more or fewer men than an ordinary jury." 167 U. S., at 593. The Court relied upon prior cases that had assumed the absence of a constitutional right to a jury determination of just compensation. See, *e. g., Shoemaker*, 147 U. S., at 301–302, 304–305 (upholding statute providing for ascertainment of the value of condemned land by three presidentially appointed commissioners); *Jones*, 109 U. S., at 519 ("The proceeding for the ascertainment of the value of the property and consequent compensation to be made, is merely an inquisition to establish a particular fact as a preliminary to the actual taking; and it may be prosecuted before commissioners or special boards or the courts, with or without the intervention of a jury, as the legislative power may designate"). See also *Kohl v. United States*, 91 U. S. 367, 376 (1876) ("That [the right of eminent domain] was not enforced through the agency of a jury is immaterial; for many civil as well as criminal proceedings at common law were without a jury"); *Crane v. Hahlo*, 258 U. S. 142, 147 (1922) ("[T]he reference of such a question [determining the amount of compensation], especially in eminent domain proceedings, to a commission, or board, or sheriff's jury, or other non-judicial tribunal, was so common in England and in this country prior to the adoption of the Federal

and we have since then thought it "long . . . settled that there is no constitutional right to a jury in eminent domain proceedings," *United States* v. *Reynolds,* 397 U. S. 14, 18 (1970).[2]   See 12 C. Wright, A. Miller, & R. Marcus, Federal Practice and Procedure § 3051, p. 224 (1997) ("It is absolutely settled that there is no constitutional right to a trial by jury in compensation cases").

The reason that direct condemnation proceedings carry no jury right is not that they fail to qualify as "Suits at common law" within the meaning of the Seventh Amendment's guarantee, for we may assume that they are indeed common law proceedings,[3] see *Kohl* v. *United States,* 91 U. S. 367, 376 (1876) ("The right of eminent domain always was a right at common law"); *Louisiana Power & Light Co.* v. *City of Thibodaux,* 360 U. S. 25, 28 (1959) ("[A]n eminent domain proceeding is deemed for certain purposes of legal classification a 'suit at common law' "). The reason there is no right to

Constitution that it has been held repeatedly that it is a form of procedure within the power of the State to provide").

[2] Similarly, the Due Process Clause of the Fourteenth Amendment does not require a jury trial in state condemnation proceedings. See, *e. g., Long Island Water Supply Co.* v. *Brooklyn,* 166 U. S. 685, 694 (1897); *Crane, supra,* at 147; *Dohany* v. *Rogers,* 281 U. S. 362, 369 (1930).

[3] Several commentators and courts have advanced theories that a condemnation proceeding is not an action at law, but rather is either some sort of special proceeding, or else an equitable proceeding. See, *e. g.,* H. Mills & A. Abbott, Mills on Law of Eminent Domain § 84, p. 225 (2d ed. 1888); *id.,* § 91, at 239 ("Condemnation is not an action at law, but an inquisition on the part of the state for the ascertainment of a particular fact, and may be conducted without the intervention of a jury"); 1A J. Sackman, Nichols on Eminent Domain § 4.105[1], p. 4–137 (rev. 3d ed. 1998) ("Condemnation proceedings are not suits at common law"). There is some accumulated support for the idea that condemnation proceedings derive from the writ *ad quod damnum,* which was issued by the courts of equity to the sheriff to conduct an inquest into the amount of damages incurred by a landowner as a result of the taking. Nonetheless, since *Kohl* v. *United States, supra,* at 376, the first case involving the Federal Government's exercise of its power of eminent domain, this Court has classified condemnation proceedings as suits at common law.

jury trial, rather, is that the Seventh Amendment "preserve[s]" the common law right where it existed at the time of the framing, but does not create a right where none existed then. See U. S. Const., Amdt. 7 ("In Suits at common law . . . the right of trial by jury shall be preserved"). See also 5 J. Moore, J. Lucas, & J. Wicker, Moore's Federal Practice ¶ 38.32[1], p. 38–268 (2d ed. 1996) ("[T]he Seventh Amendment does not guarantee a jury trial in all common law actions in the federal courts; [instead] it preserves the right of jury trial as at common law"). There is no jury right, then, because condemnation proceedings carried "no uniform and established right to a common law jury trial in England or the colonies at the time . . . the Seventh Amendment was adopted." *Ibid.* See, *e. g., Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n,* 430 U. S. 442, 458 (1977) ("Condemnation was a suit at common law but constitutionally could be tried without a jury"). The statement in *Reynolds* indeed expressly rested on these considerations, as shown in the Court's quotation of Professor Moore's statement that "[t]he practice in England and in the colonies prior to the adoption in 1791 of the Seventh Amendment, the position taken by Congress contemporaneously with, and subsequent to, the adoption of the Amendment, and the position taken by the Supreme Court and nearly all of the lower federal courts lead to the conclusion that there is no constitutional right to jury trial in the federal courts in an action for the condemnation of property under the power of eminent domain." *Reynolds, supra,* at 18 (quoting 5 J. Moore, Federal Practice ¶ 38.32[1], p. 239 (2d ed. 1969) (internal quotation marks omitted)).

The Court in *Reynolds* was on solid footing. In England, while the general practice of Parliament was to provide for the payment of compensation, parliamentary supremacy enabled it to take private property for public use without compensation. See, *e. g.,* Randolph, The Eminent Domain, 3 L. Q. Rev. 314, 323 (1887) ("That there is no eminent domain

*sub nomine* in England is because the power is included, and the right to compensation lost, in the absolutism of Parliament. The only technical term approximating eminent domain is 'compulsory powers' as used in statutes granting to companies and associations the right to take private property for their use"). See also McNulty, The Power of "Compulsory Purchase" Under the Law of England, 21 Yale L. J. 639, 644–646 (1912). Thus, when Parliament made provision for compensation, it was free to prescribe whatever procedure it saw fit, and while the agency of a common law jury was sometimes chosen, very frequently other methods were adopted. See Blair, Federal Condemnation Proceedings and the Seventh Amendment, 41 Harv. L. Rev. 29, 32–36 (1928); *id.*, at 36 ("[A]n ample basis exists in the parliamentary precedents for the conclusion that the common law sanctioned such diverse methods of assessment that no one method can be said to have been made imperative by the Seventh Amendment"). See also 1A J. Sackman, Nichols on Eminent Domain § 4.105[1], p. 4–115, and § 4.107, pp. 4–136 to 4–137 (rev. 3d ed. 1998) ("It had become the practice in almost all of the original thirteen states at the time when their constitutions were adopted, to refer the question of damages from the construction of [high]ways . . . to a commission of viewers or appraisers, generally three or five in number"); *id.*, at 4–137 ("[I]t has been repeatedly held that when land is taken by authority of the United States, the damages may be ascertained by any impartial tribunal").

In sum, at the time of the framing the notion of regulatory taking or inverse condemnation was yet to be derived, the closest analogue to the then-unborn claim was that of direct condemnation, and the right to compensation for such direct takings carried with it no right to a jury trial, just as the jury right is foreign to it in the modern era. On accepted Seventh Amendment analysis, then, there is no reason to find a jury right either by direct analogy or for the sake of preserving the substance of any jury practice known to the law

at the crucial time. Indeed, the analogy with direct condemnation actions is so strong that there is every reason to conclude that inverse condemnation should implicate no jury right.

## III

The plurality avoids this obvious conclusion in two alternative ways. One way is to disparage the comparison of inverse to direct taking, on the grounds that litigation of the former involves proof of liability that the latter does not and is generally more onerous to the landowner. The disparagement is joined with adoption of a different analogy, between inverse condemnation proceedings and actions for tortious interference with property interests, the latter of which do implicate a right to jury trial. The plurality's stated grounds for avoiding the direct condemnation analogy, however, simply break down, and so does the purported comparison to the tort actions. The other way the plurality avoids my conclusion is by endorsing the course followed by JUSTICE SCALIA in his separate opinion, by selecting an analogy not to tort actions as such, but to tort-like § 1983 actions. This alternative, however, is ultimately found wanting, for it prefers a statutory analogy to a constitutional one.

### A

#### 1

The plurality's argument that no jury is required in a direct condemnation proceeding because the government's liability is conceded, leaving only the issue of damages to be assessed, rests on a premise that is only partially true. The part that is true, of course, is that the overwhelming number of direct condemnation cases join issue solely on the amount of damages, that is, on the just compensation ·due the landowner. But that is not true always. Now and then a landowner will fight back by denying the government's right to condemn, claiming that the object of the taking was not a public purpose or was otherwise unauthorized by statute.

See, *e. g., Hawaii Housing Authority* v. *Midkiff,* 467 U. S. 229, 240 (1984) ("There is . . . a role for courts to play in reviewing a legislature's judgment of what constitutes a public use, even . . . [if] it is an 'extremely narrow' one" (citation omitted)); *Shoemaker,* 147 U. S., at 298. See also 2A Sackman, *supra,* at 7–81 to 7–82, and nn. 89–90 (listing state cases where condemnation clauses and the Due Process Clause of the Fourteenth Amendment have been relied upon by property owners to contest attempts to acquire their property for private purposes); 2 J. Lewis, Law of Eminent Domain § 417, p. 923, and n. 51 (2d ed. 1900). What is more, when such a direct condemnation does have more than compensation at stake, the defense of no public purpose or authority closely resembles, if indeed it does not duplicate, one of the grounds of liability for inverse condemnation noted in *Agins,* 447 U. S., at 260–261, and raised in this case: the failure of the regulation to contribute substantially to the realization of a legitimate governmental purpose.[4]  Indeed, the distinction between direct and inverse condemnation becomes murkier still when one considers that, even though most inverse condemnation plaintiffs accept the lawfulness of the taking and just want money, see *infra,* at 747, n. 7, some such plaintiffs ask for an injunction against the government's action, in which event they seek the same ultimate relief as the direct condemnee who defends against the taking as unauthorized. If the direct condemnee has no right to a jury, see 2A Sackman, Nichols on Eminent Domain § 7.03[11][a], at 7–90 ("The question of whether a legislative determination of a public use is really public has been declared by the courts ultimately to be a judicial one"), the inverse condemnee should fare no differently.

---

[4] See, *e. g.,* J. Laitos, Law of Property Rights Protection § 12.04[A], pp. 12–12 to 12–13 (1999) ("The police power takings standard also means that the taking prohibition becomes more like a due process check on the police power"; describing two claims as "an identical test").

This recognition may underlie the fact that the plurality's absence-of-liability-issue reasoning for distinguishing direct and inverse condemnation fails to resonate through the cases holding that direct actions carry no jury right or commenting on the absence of juries in such cases. While the plurality cites an opinion of Justice Baldwin, sitting on Circuit, for its position, *ante*, at 713 (citing *Bonaparte* v. *Camden & Amboy R. Co.*, 3 F. Cas. 821, 829 (No. 1,617) (CC NJ 1830)), this citation leaves the reader with a rather skewed perspective on the diversity of rationales underlying early state cases in which the right of a direct condemnee to a jury trial was considered and denied. Several courts rested on the fact that proceedings to secure compensation were in the nature of suits against the sovereign, and thus the legislature could qualify and condition the right to bring such suits, at least to the extent of providing that they be conducted without a jury. See, *e. g.*, *Ligat* v. *Commonwealth*, 19 Pa. 456, 460 (1852) ("A sovereign state is not liable to an action at law, against her consent; and the right of trial by jury has, therefore, no existence in such a case"); *Pennsylvania R. Co.* v. *First German Lutheran Congregation of Pittsburgh*, 53 Pa. 445, 449 (1866) ("In taking private property for its road [the railroad corporation] exercises a part of the sovereign power of the state . . . [and] the right of trial by jury has never been held to belong to the citizen himself in proceedings by the state under her powers of eminent domain"). See also *McElrath* v. *United States*, 102 U. S. 426, 440 (1880). Just as significantly, the plurality's new rationale is absent from any of our precedents, including those underlying the *Reynolds* decision.[5]

---

[5] See n. 1, *supra*. Moreover, if presence of a liability issue were crucial, then the jury right presumably would be lost in every tort case with liability conceded, which goes to trial on damages alone. Such, of course, is not the practice. See, *e. g.*, *Blazar* v. *Perkins*, 463 A. 2d 203, 207 (R. I. 1983) ("The fact that prior to trial, defendants admitted liability, thereby removing one issue from the consideration of the jury, does not alter the

Finally, the absence of the plurality's rationale from our prior discussions of the matter most probably reflects the fact that the want of a liability issue in most condemnation cases says nothing to explain why no jury ought to be provided on the question of damages that always is before the courts. The dollars-and-cents issue is about as "factual" as one can be (to invoke a criterion of jury suitability emphasized by the Court in another connection, *ante*, at 720–721), and no dispute about liability provokes more contention than the price for allowing the government to put a landowner out of house and home. If an emphasis on factual issues vigorously contested were a sufficient criterion for identifying something essential to the preservation of the Seventh Amendment jury right, there ought to be a jury right in direct condemnation cases as well as the inverse ones favored by the plurality.

The plurality's second reason for doubting the comparability of direct and inverse condemnation is that the landowner has a heavier burden to shoulder in the latter case, beginning with a need to initiate legal action, see *United States* v. *Clarke*, 445 U. S., at 257. Once again, however, it is apparent that the two varieties of condemnation are not always so distinguishable. The landowner who defends in a direct condemnation action by denying the government's right to take is in no significantly different position from the inverse condemnee who claims the government must pay or be enjoined because its regulation fails to contribute substantially to its allegedly public object. See, *e. g.*, 2A Sackman, *supra*, § 7.03[12], at 7–105 to 7–106 (citing cases where "the challenger has the burden of proof to show that the taking is not for a public purpose"). And once again one may ask why, even if the inverse condemnee's burden always were the heavier, that should make any difference. Some plaintiffs' cases are easy and some are difficult, but the difficult ones

---

application of th[e] principle [that plaintiffs cannot waive a jury trial on the issue of damage when defendants have demanded a jury trial]").

are no different in front of a jury (except on the assumption that juries are more apt to give David the advantage against Goliath, which I do not believe is the plurality's point). Neither the Fifth nor the Seventh Amendment has ever been thought to shift and spring with ease of proof. Cf. *United States v. 101.88 Acres of Land, More or Less, Situated in St. Mary Parish, La.*, 616 F. 2d 762, 772 (CA5 1980) ("The 5th Amendment, while it guarantees that compensation be just, does not guarantee that it be meted out in a way more convenient to the landowner than to the sovereign").

2

Just as the plurality's efforts to separate direct from inverse condemnation actions thus break down, so does its proposal to analogize inverse condemnation to property damage torts. Whereas the plurality posits an early practice of litigating inverse condemnation as a common law tort, there was in fact a variety of treatments, some of them consistent with the plurality's argument, some of them not. None of those treatments turned on the plurality's analysis that a State's withholding of some recovery process is essential to the cause of action. In the end, the plurality's citations simply do not point to any early practice both consistently followed and consistent with the concepts underlying today's inverse condemnation law.

a

The plurality introduces its claimed analogue of tort actions for property damage by emphasizing what it sees as a real difference between the action of the government in direct condemnations, and those inverse condemnations, at least, that qualify for litigation under § 1983. Whereas in eminent domain proceedings the government admits its liability for the value of the taking, in the inverse condemnation cases litigated under § 1983, it refuses to do so inasmuch as it denies the landowner any state process (or effective process) for litigating his claim. See *Williamson County Re-*

gional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U. S. 172, 194–195 (1985). Thus the plurality explains that

> "[a]lthough the government acts lawfully when, pursuant to proper authorization, it takes property and provides just compensation, the government's action is lawful solely because it assumes a duty, imposed by the Constitution, to provide just compensation. See First English, 482 U. S., at 315 (citing Jacobs, 290 U. S., at 16). When the government repudiates this duty, either by denying just compensation in fact or by refusing to provide procedures through which compensation may be sought, it violates the Constitution. In those circumstances the government's actions are not only unconstitutional but unlawful and tortious as well." Ante, at 717.

According to the plurality, it is the taking of property without providing compensation or a mechanism to obtain it that is tortious and subject to litigation under § 1983. See ante, at 714–715, 717. By this reasoning, the plurality seeks to distinguish such a § 1983 action from a direct condemnation action and possibly from "an ordinary inverse condemnation suit," as well, ante, at 721, by which the plurality presumably means a suit under a state law providing a mechanism for redress of regulatory takings claims.

The plurality claims to have authority for this view in some early state and federal cases seeing regulatory interference with land use as akin to nuisance, trespass, or trespass on the case, ante, at 715–716, and I agree that two of the plurality's cited cases,[6] decided under state law, are

---

[6] Two of the cases cited by the plurality offer at most tangential support. Plaintiff's claim in Barron ex rel. Tiernan v. Mayor of Baltimore, 7 Pet. 243, 249 (1833), was dismissed for lack of jurisdiction, on the ground that the Fifth Amendment was not applicable to the States. In Lindsay v. Commissioners, 2 Bay 38 (S. C. 1796), the plaintiff sought a writ of prohibition restraining city commissioners from laying out a street, not damages. While the plurality relies on the opinion of one justice favoring the grant-

authority for the tort treatment the plurality claims to be the appropriate analogy. See *Gardner* v. *Village of Newburgh*, 2 Johns. Ch. 162 (N. Y. 1816) (Kent, Ch.); *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166 (1872). One other is arguably such authority; *Richards* v. *Washington Terminal Co.*, 233 U. S. 546 (1914), is somewhat ambiguous, holding that the law of nuisance would provide compensation for interference with enjoyment of land when the State chose not to take the interest by direct condemnation; the measure of damages (not explained) may well have been what the Fifth Amendment would provide for a temporary partial taking.

Beyond these cases, however, any prospect of a uniform tort treatment disappears. One of the plurality's cited cases, *Bradshaw* v. *Rodgers*, 20 Johns. 103 (N. Y. 1822), was reversed by *Rogers* v. *Bradshaw*, 20 Johns. 735 (N. Y. 1823). As the concept of public liability was explained in the latter opinion, it turned not on an issue of garden variety tort law, but on whether there was a total absence or not of legal authority for a defending public officer's action with respect to the land. See *id.*, at 743 ("I should doubt exceedingly, whether the general principle, that private property is not to be taken for public uses without just compensation, is to be carried so far as to make a public officer, who enters upon private property by virtue of legislative authority, specially given for a public purpose, a *trespasser*, if he enters before the property has been paid for. I do not know, nor do I find, that the precedents will justify any court of justice in carrying the general principle to such an extent"). See also Brauneis, The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law, 52 Vand. L. Rev. 57, 64–65 (1999) (demonstrating that pre-Civil War owner-initiated just compensation plaintiffs

---

ing of the writ, the court actually divided equally, the result being denial of the writ. Moreover, even within that opinion, the quoted statement is the equivalent of dictum since it is not necessary to the reasoning in favor of granting the writ.

could recover retrospective damages under common law action of trespass or trespass on the case only after defendant was "stripped of his [legislative] justification"). Cf. *Leader* v. *Moxon*, 2 Black. W. 924, 927, 96 Eng. Rep. 546, 547 (C. P. 1773) (commissioners acted outside their statutory authority and were thus liable in tort); *Boulton* v. *Crowther*, 2 Barn. & Cress. 701, 707, 107 Eng. Rep. 544, 547 (K. B. 1824). Under these cases, there would be no recovery unless the public officer interfering with the property right was acting wholly without authority. But as absence of legal authorization becomes crucial to recovery, the analogy to tort liability fades. What is even more damaging to the attempted tort analogy, whether it rests on simple tort cases like *Gardner* or legal authorization cases like *Bradshaw*, is that this very assumption that liability flows from wrongful or unauthorized conduct is at odds with the modern view of acts effecting inverse condemnation as being entirely lawful.[7] See *First English Evangelical Lutheran*, 482 U. S., at 314–315 (citing *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S., at 194; *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 297, n. 40 (1981); *Hurley* v. *Kincaid*, 285 U. S., at 104; *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 336 (1893); *United States* v. *Jones*, 109 U. S., at 518). Unlike damages to redress a wrong as understood in *Gardner* or *Bradshaw* (or even in a modern tort action), a damages award in an inverse condemnation action orders payment of the "just compensation" required by the Constitution for payment of an obligation lawfully incurred.

To the plurality's collection of tort and authorization cases, one must add those that are so far from reflecting any early understanding of inverse condemnation as conventionally

---

[7] When an inverse condemnee seeks an injunction (as when a direct condemnee challenges the taking, or a plaintiff claims a substantive due process violation), there is a claim of wrong in the sense of lack of authority. But this is not so in the usual case where damages are sought.

tortious that they treat inverse condemnation as grounding an action in quasi contract, see, *e. g., Jacobs* v. *United States,* 290 U. S., at 16. Although the quasi-contractual action seems to be the closest cousin to the plurality's conception of § 1983 as applied here, the resemblance is limited by that strain of quasi-contract[8] theory holding that the defendant must pay for what he has received to avoid unjust enrichment, see E. Farnsworth, Contracts § 2.20, p. 101 (3d ed. 1999), whereas the theory of just compensation for a taking is that the owner must be paid for what he has lost, *United States* v. *Miller,* 317 U. S. 369, 373–374 (1943).

After a canvass of these materials, the only conclusion that seems reasonable to me is that prior to the emergence of the modern inverse condemnation action a spectrum of legal theories was employed to respond to the problem of inverse taking. No one of these experiments can be accepted as a definitive analogue of the contemporary action, and each of them is inconsistent in some way with the contemporary view that inverse condemnation enforces payment for the owner's value in property lawfully taken.

b

If the chosen tort analogy were not already too weak to sustain the plurality's position, it would be rendered so by the plurality's inability to identify any tort recovery under the old cases for the government's sin of omission in failing to provide a process of compensation (which the plurality finds at the heart of the § 1983 claim), as distinct from the acts of interfering with use or enjoyment of land. The plurality simply fails to find any analogue on this element, and its failure is in fact matched by the failure of its § 1983 theory to fit the reality of § 1983 litigation for inverse takings. When an inverse condemnation claim is brought under § 1983, the "provision" of law that is thereby enforced,

---

[8] See 1 R. Lord, Williston on Contracts § 1.6, pp. 27–28 (4th ed. 1990) (restitution not limited by theory of unjust enrichment).

*Golden State Transit Corp.* v. *Los Angeles,* 493 U. S. 103, 106 (1989), is the Fifth Amendment Just Compensation Clause and no other.[9]   There is no separate cause of action for withholding process, and respondents in the instant case do not claim otherwise; they simply seek just compensation for their land, subject to the usual rules governing § 1983 liability and damages awards.[10]

c

Finally, it must be said that even if the tort analogue were not a failure, it would prove too much.   For if the comparison to inverse condemnation were sound, it would be equally

---

[9] Of course, § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker* v. *McCollan,* 443 U. S. 137, 144, n. 3 (1979).   Accord, *Johnson* v. *University of Wisconsin-Eau Claire,* 70 F. 3d 469, 481 (CA7 1995) ("Because § 1983 does not create substantive rights, but rather provides a remedy for violations of pre-existing rights, § 1983 claims must specifically allege a violation of the Constitution or 'laws' of the United States").

[10] Respondents in this case sought damages for the fair market value of the property, interim damages for a temporary taking, holding costs, interest, attorney's fees, costs, and other consequential damages.   Complaint pp. 14–15; First Amended Complaint pp. 16–17.   The jury was instructed that in calculating damages: "[I]t's up to you to decide the difference in value, the fair market value as a result of the City's decision.   Multiply it by an interest rate you think is appropriate, for a length of time you think is appropriate.   So those are the three elements of computing the damages claimed if you determine the plaintiff is entitled to recover."   11 Record 1426.   Respondents thus sought no incremental "damages" (beyond just compensation) for denial of state compensation procedures.   Indeed, the only "damages" available in inverse condemnation cases is the just compensation measured by the value of the land.   See *supra,* at 734.   See, *e. g., Eide* v. *Sarasota County,* 908 F. 2d 716 (CA11 1990).   The fact that no further element of damages is recognized confirms rejection of the tort analogy, for it would be a peculiar tort indeed that did not recognize its concomitant injury in damages.   Cf. *Miller* v. *Campbell County,* 854 P. 2d 71, 77 (Wyo. 1993) (rejecting reliance on tort law in holding that emotional distress is not a proper element of damages in inverse condemnation actions).

sound as to direct condemnation and so require recognition of the very jury right that we have previously denied. This perception was apparent to the Court of Appeals in this case, when it wrote (erroneously) that "both eminent domain and inverse condemnation actions resemble common-law actions for trover to recover damages for conversion of personal property, and detinue and replevin." 95 F. 3d 1422, 1427 (CA9 1996). The Court of Appeals, indeed, cited *Beatty* v. *United States*, 203 F. 620 (CA4 1913), as does the plurality, *ante*, at 717, in which the Fourth Circuit held that the landowner in a direct condemnation proceeding had a Seventh Amendment right to a jury determination of just compensation:

> "The taking of property by condemnation under the power of eminent domain is compulsory. The party is deprived of his property against his will. . . . The analogy to a suit at common law for trespass is close and complete, and it is for that reason presumably the Supreme Court of the United States, acting on the definition of a suit at common law previously indicated by it, has decided that a proceeding by the United States to condemn lands for public purposes is a suit at common law. If so it be, then it would follow that the defendant, if he claims it, is entitled at some stage in the proceeding to have his damages assessed by a jury." 203 F., at 626.

The plurality's analogy, if accepted, simply cannot be confined to inverse condemnation actions alone, and if it is not so confined it runs squarely against the settled law in the field of direct condemnation.

## B

In addition to the plurality's direct tort analogy, the Court pursues a different analytical approach in adopting JUSTICE SCALIA's analogy to § 1983 actions seeking legal relief, see *ante*, at 709. JUSTICE SCALIA begins with a more sweeping

claim: "The central question remains whether a *§ 1983 suit* is entitled to a jury." *Ante,* at 724 (opinion concurring in part and concurring in judgment). The analogy to the broad class of § 1983 actions is put forward as serving the undoubted virtues of simplicity and uniformity in treating various actions that may be brought under a single remedial statute. It is only when "apply[ing] this methodology to the present case," *ante,* at 727, that JUSTICE SCALIA is careful not to claim too much: he no longer argues for drawing an analogy between § 1983 inverse condemnation actions and all § 1983 actions, but only those § 1983 actions brought to recover money damages, see *ante,* at 729. This subclass of § 1983 actions, he quite correctly notes, has been treated as tortlike in character and thus as much entitled to jury trial as tort actions have been at common law. For two independent reasons, however, I think the analogy with § 1983 actions, either as a class or as a subclass of damages actions, is inadequate.

1

First, the analogy to all § 1983 actions does not serve any unified field theory of jury rights under § 1983. While the statute is indeed a prism through which rights originating elsewhere may pass on their way to a federal jury trial, trial by jury is not a uniform feature of § 1983 actions. The statute provides not only for actions at law with damages remedies where appropriate, but for "suit[s] in equity, or other proper proceeding[s] for redress." 42 U. S. C. § 1983. Accordingly, rights passing through the § 1983 prism may in proper cases be vindicated by injunction, see, *e. g., Mitchum* v. *Foster,* 407 U. S. 225, 242–243 (1972) (§ 1983 falls within "expressly authorized" exception of Anti-Injunction Act and thus authorizes injunctions staying state-court proceedings), by orders of restitution, see, *e. g., Samuel* v. *University of Pittsburgh,* 538 F. 2d 991, 994–995 (CA3 1976) (restitution of university fees collected pursuant to rule held to violate Equal Protection Clause), and by declaratory judgments, see,

*e. g.*, *Steffel* v. *Thompson*, 415 U. S. 452, 454, 475 (1974) (declaratory relief under § 1983 available in suit claiming state criminal statute constitutionally invalid), none of which implicate, or always implicate, a right to jury trial. Comparing inverse condemnation actions to the class of § 1983 actions that are treated like torts does not, therefore, preserve a uniformity in jury practice under § 1983 that would otherwise be lost. JUSTICE SCALIA's metaphor is, indeed, an apt one: § 1983 is a prism, not a procrustean bed.

Nor, as I have already mentioned, see *supra*, at 748–750, is there a sound basis for treating inverse condemnation as providing damages for a tort. A State's untoward refusal to provide an adequate remedy to obtain compensation, the *sine qua non* of an inverse condemnation remedy under § 1983, is not itself the independent subject of an award of damages (and respondents do not claim otherwise); the remedy is not damages for tortious behavior, but just compensation for the value of the property taken.

2

Even if an argument for § 1983 simplicity and uniformity were sustainable, however, it would necessarily be weaker than the analogy with direct condemnation actions. That analogy rests on two elements that are present in each of the two varieties of condemnation actions: a Fifth Amendment constitutional right and a remedy specifically mandated by that same amendment. Because constitutional values are superior to statutory values, uniformity as between different applications of a given constitutional guarantee is more important than uniformity as between different applications of a given statute. If one accepts that proposition as I do, a close analogy between direct and inverse condemnation proceedings is necessarily stronger than even a comparably close resemblance between two statutory actions.

## IV

Were the results of the analysis to this point uncertain, one final anomaly of the Court's position would point up its error. The inconsistency of recognizing a jury trial right in inverse condemnation, notwithstanding its absence in condemnation actions, appears the more pronounced on recalling that under *Agins* one theory of recovery in inverse condemnation cases is that the taking makes no substantial contribution to a legitimate governmental purpose.[11]   This issue includes not only a legal component that may be difficult to resolve, but one so closely related to similar issues in substantive due process property claims, that this Court cited a substantive due process case when recognizing the theory under the rubric of inverse condemnation.   See *Agins,* 447 U. S., at 260 (citing *Nectow* v. *Cambridge,* 277 U. S. 183, 188 (1928)).[12]   Substantive due process claims are, of course, routinely reserved without question for the court.   See, *e. g., County of Sacramento* v. *Lewis,* 523 U. S. 833, 853–855 (1998); *Washington* v. *Glucksberg,* 521 U. S. 702, 722–723 (1997); *FM Properties Operating Co.* v. *Austin,* 93 F. 3d 167, 172, n. 6 (CA5 1996) (rational relationship to legitimate government interest for purposes of substantive due process a question of law for the court); *Sameric Corp.* v. *Philadelphia,* 142 F. 3d 582, 590–591 (CA3 1998) (same as to city

---

[11] The jury's inverse condemnation verdict did not indicate which of the theories formed the basis of its liability finding: (1) whether the city's action did not substantially advance a legitimate purpose; or (2) whether the city's denial of the permit deprived the subject property of all economically viable use.

[12] I offer no opinion here on whether *Agins* was correct in assuming that this prong of liability was properly cognizable as flowing from the Just Compensation Clause of the Fifth Amendment, as distinct from the Due Process Clauses of the Fifth and Fourteenth Amendments.

historical commission action).[13] Thus, it would be far removed from usual practice to charge a jury with the duty to assess the constitutional legitimacy of the government's objective or the constitutional adequacy of its relationship to the government's chosen means.

The usual practice makes perfect sense. While juries are not customarily called upon to assume the subtleties of deferential review, courts apply this sort of limited scrutiny in all sorts of contexts and are routinely accorded institutional competence to do it. See, *e. g., Pearson* v. *Grand Blanc*, 961 F. 2d 1211, 1222 (CA6 1992) (deferential substantive due process review a matter of law for the court). Scrutinizing the legal basis for governmental action is "one of those things that judges often do and are likely to do better than jurors unburdened by training in exegesis." *Markman*, 517 U. S., at 388. It therefore should bring no surprise to find that in the takings cases a question whether regulatory action substantially advances a legitimate public aim has more often than not been treated by the federal courts as a legal issue. See, *e. g., New Port Largo, Inc.* v. *Monroe County*, 95 F. 3d 1084, 1092 (CA11 1996) (whether regulatory taking occurred is an issue for the court); *Mid Gulf, Inc.* v. *Bishop*, 792 F. Supp. 1205, 1213–1214, 1215 (Kan. 1992) (whether city's regulations unreasonable and a taking a question of law for the court); *Gissel* v. *Kenmare Township*, 512 N. W. 2d 470, 474 (N. D. 1994) (necessity for proposed taking a question for the court); *Yegen* v. *Bismarck*, 291 N. W. 2d 422, 424 (N. D. 1980) (taking *vel non* of private property for public use a question of law). But see *Gray* v. *South Carolina Dept. of Highways*, 427 S. E. 2d 899 (S. C. App. 1992) (whether no taking because closing of intersection was needed to prevent serious public harm is jury issue). These practices point up

---

[13] The substantive due process takings claim concentrates on whether the government's aims are "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 395 (1926).

the great gulf between the practical realities of takings litigation, and the Court's reliance on the assertion that "in suits sounding in tort for money damages, questions of liability were decided by the jury, rather than the judge, in most cases," *ante*, at 718.

Perhaps this is the reason that the Court apparently seeks to distance itself from the ramifications of today's determination. The Court disclaims any attempt to set a "precise demarcation of the respective provinces of judge and jury in determining whether a zoning decision substantially advances legitimate governmental interests." *Ante*, at 722. It denies that today's holding would extend to "a broad challenge to the constitutionality of the city's general land-use ordinances or policies," in which case, "the determination whether the statutory purposes were legitimate, or whether the purposes, though legitimate, were furthered by the law or general policy, might well fall within the province of the judge." *Ibid.* (And the plurality presumably does not mean to address any Seventh Amendment issue that someone might raise when the government has provided an adequate remedy, for example, by recognizing a compensatory action for inverse condemnation, see *ante*, at 714–715, 717.) But the Court's reticence is cold comfort simply because it rests upon distinctions that withstand analysis no better than the tort-law analogies on which the Court's conclusion purports to rest. The narrowness of the Court's intentions cannot, therefore, be accepted as an effective limit on the consequences on its reasoning, from which I respectfully dissent.[14]

---

[14] I would therefore remand the case. There would be no need for a new trial; the judge could treat the jury's verdict as advisory, so long as he recorded his own findings consistent with the jury's verdict. See Fed. Rule Civ. Proc. 52(a).