LASALLE BANK NATIONAL ASSOCIATION, as Successor Trustee to First State Bank and Trust Company of Franklin Park, as Trustee Under Trust Agreement Dated July 30, 1982, a/k/a Trust No. 866, *et al.*, Plaintiffs-Appellants, v. THE CITY OF OAKBROOK TERRACE *et al.*, Defendants-Appellees.

Second District    No. 2—07—0468

Opinion filed July 22, 2009.

Jacqueline J. Gust and Stephen D. Helm, both of Helm & Wagner, of Naperville, for appellants.

Andrew Y. Acker and Kenneth T. Kubiesa, both of Kubiesa, Spiroff, Gosselar, Acker & DeBlasio, P.C., of Elmhurst, for appellees.

JUSTICE HUDSON delivered the opinion of the court:

On August 29, 2006, plaintiffs, LaSalle Bank National Association, as successor trustee to First State Bank and Trust Company of Franklin Park, as trustee under trust agreements dated July 30, 1982, and known as Trust Nos. 866 and 867 (LaSalle); Donna L. Krilich; and Robert R. Krilich, Sr., filed their first-amended complaint against defendants, the City of Oakbrook Terrace and Thomas Mazaika, as mayor of the City of Oakbrook Terrace. In the complaint, plaintiffs requested the issuance of a writ of *mandamus* compelling defendants to initiate condemnation proceedings with respect to certain property located in Oakbrook Terrace. Defendants filed a motion to dismiss plaintiffs' first-amended complaint, pursuant to section 2—615 of the Code of Civil Procedure (Code) (735 ILCS 5/2—615 (West 2006)). Finding a lack of ripeness, the circuit court of Du Page County granted defendants' motion and dismissed with prejudice plaintiffs' first-amended complaint. We affirm.

## I. BACKGROUND

### A. The Parties

LaSalle is the record titleholder of approximately 100 acres of real property (subject property) located within the corporate limits of the City of Oakbrook Terrace. Robert R. Krilich, Sr. (Robert), is the beneficial owner of the subject property. Donna L. Krilich (Donna) is Robert's spouse and holds a power of attorney over the land trusts that are the record titleholders of the subject property. The City of Oakbrook Terrace (City) is a municipal corporation located in Du Page County, Illinois. Thomas Mazaika (Mazaika) was the City's mayor at the time plaintiffs initiated this action.

### B. The Annexation and Rezoning of the Subject Property

According to plaintiffs' first-amended complaint, the subject property was formerly part of a 120-acre parcel (annexation parcel) that was annexed into the City. Twenty acres of the annexation parcel were later sold and developed as part of Lincoln Centre.[1] Prior to the annexation, the annexation parcel was part of Du Page County and was zoned R-3 with a special use for multiple-family development. This zoning classification permitted development of approximately 2,000 multiple-family dwelling units.

---

[1]The owners of the Lincoln Centre property are not parties to this appeal.

In 1972, the City, Robert, and Donna executed an "Annexation Agreement" pursuant to which the City annexed the annexation parcel. In conjunction with the annexation, the City adopted an ordinance whereby the annexation parcel was zoned within the B-4 service district with a special use for a planned unit development. See Oakbrook Terrace Ordinance No. 72—7 (1972). This zoning classification permitted both commercial and residential development, including the construction of 2,731 multifamily residential dwelling units in low-, mid-, and high-rise buildings. From the date the subject property was zoned B-4, various roadways, townhomes, recreational facilities, utilities, sidewalks, and an office complex were constructed on the subject property. On November 28, 1986, following the expiration of the Annexation Agreement, the City entered into an agreement with Robert and Donna (1986 Agreement), which, according to plaintiffs' complaint, "recogniz[ed] and agree[d] that the OWNERS were vested with the right to complete the development of the [subject property] in accord with the provisions of the Annexation Agreement." Thereafter, subsequent development included the construction of a portion of the commercial area of the annexation parcel that has subsequently become known as Lincoln Centre and the development of the subject property with additional utilities, roads, and stormwater detention facilities.

In 2003, the City adopted an ordinance amending its "Official Comprehensive Plan." See Oakbrook Terrace Ordinance No. 02—73 (2003). This ordinance created the "Unit 5 Area Plan," which applied to approximately 236 acres of land within the City, including the subject property. The City also amended its zoning ordinance to create a new district called the "M-U" or "Mixed-Use Zoning District." See Oakbrook Terrace Ordinance No. 03—37 (November 25, 2003). Subsequently, the City rezoned the subject property from B-4 to the new M-U classification. See Oakbrook Terrace Ordinance No. 03—44 (January 1, 2004). The M-U district is comprised of three subdistricts, one of which is a planned residential subdistrict. The planned residential subdistrict provides for single-family attached and detached residences at an overall gross density of no more than seven dwelling units per acre. According to plaintiffs, under the M-U classification, the further development of the residential portion of the subject property would be limited to approximately 300 dwelling units, as opposed to the more than 2,700 units for which it was previously zoned.

### C. Development Contract

On August 18, 2005, AvalonBay Communities, Inc. (AvalonBay), entered into a purchase and sale contract with plaintiffs for ap-

proximately 82.4 acres of the subject property (vacant property). As amended, the contract provided that if AvalonBay obtained approval for 2,731 dwelling units, AvalonBay would pay $105,620,000 for the vacant property. Between August 2005 and February 2006, AvalonBay met with representatives from the City regarding its proposed development. AvalonBay's initial proposal for the vacant property consisted of 2,000 residential units and 2.5 acres of retail development. After consulting with the City, AvalonBay revised the residential portion of the proposed development, first to 1,741 units, and later to 1,550 units. During its discussions with the City, AvalonBay also learned that the City would require: (1) a monetary contribution of $3 million for a new water tower, new waste storage and lift station improvements, a new stoplight, and the extension of a private road; (2) the payment of impact fees and water tap-on fees of approximately $20 million; and (3) the donation of 25 acres of land to local park districts.

Ultimately, AvalonBay proposed a reduction in the number of dwelling units of the development to 1,488, consisting of 331 townhomes, 352 condominiums, 368 senior-citizen units, and 437 apartments. In a letter to plaintiffs dated February 28, 2006, AvalonBay detailed these revisions and proposed a reduction in the purchase price of the vacant property. As amended, the contract would have provided for "a floor purchase price of $62,500,000 at the land closing based on a total of 1,488 units and *** 2.5 acres of retail." The floor purchase price represented $6.1 million for the apartment component and $56.4 million for the remaining land basis. AvalonBay further proposed that, "[i]n addition to the $62.5 million, any sale proceeds generated from the condos, senior, townhouse and retail products over the $56.4 land basis amount would be split 75% to Mr. Krilich and 25% to Avalon-Bay." AvalonBay also indicated in the letter that it "would endeavor to exceed the 1,488 total minimum unit count and would file the plan based on 1,664 units." LaSalle and Robert did not agree to Avalon-Bay's proposed amendment and terminated the contract.

### D. Stormwater Exemption List

In 1991, the County of Du Page adopted a "Countywide Stormwater and Floodplain Ordinance" (Stormwater Ordinance). With minor revisions, the City adopted the Stormwater Ordinance in April 1992. The Stormwater Ordinance allows a municipality to exempt certain properties within its jurisdiction from the regulations imposed by the ordinance. When the City adopted the Stormwater Ordinance in 1992, it exempted the subject property. Pursuant to the terms of the Stormwater Ordinance, a municipality may delete a property from the exemption list after it determines that the criteria for exemption have

not been met or no longer exist and it approves such removal by official action after having provided the affected owner with notice and an opportunity to respond. On May 27, 2003, the City approved an ordinance adopting a new Du Page County "Stormwater Management and Floodplain Ordinance." The ordinance included a list of exempt properties. The subject property was not included on the list. According to plaintiffs, removal of the subject property from the list conflicts with the terms of the Annexation Agreement and the 1986 Agreement.

## E. Signage

The Annexation Agreement and the 1986 Agreement provide that all regulations concerning signs placed on the subject property are set forth in an ordinance promulgated by the City in 1965 (1965 Sign Ordinance). The 1965 Sign Ordinance sets forth the permitted gross surface area and height for signs placed on the subject property. In October 2003, the City charged one of plaintiffs' representatives with an ordinance violation, alleging that the owners of the subject property violated the 1965 Sign Ordinance and a separate ordinance requiring the removal of a sign upon 80% occupancy of the property. Ultimately, the City dismissed the citation. However, in June 2004, the City filed a complaint for injunctive and other relief concerning the same sign. On June 5, 2005, the trial court dismissed the complaint with prejudice.

## F. Plaintiffs' Complaint

Plaintiffs filed their initial complaint on May 27, 2005. On August 29, 2006, plaintiffs filed their first-amended complaint for *mandamus.* In the complaint, plaintiffs alleged that certain of the City's actions with respect to the subject property, including "down zoning," the removal of the subject property from the "stormwater exempt list," and the City's attempts to restrict the use of signage upon the subject property, constituted a taking in violation of the due process and just compensation provisions of the Illinois Constitution (Ill. Const. 1970, art. I, §§2, 15). Among other relief, plaintiffs sought the issuance of a writ of *mandamus* compelling the City to initiate a condemnation proceeding in order that just compensation for the taking may be determined. Defendants responded with a motion to dismiss plaintiffs' complaint, pursuant to section 2—615 of the Code (735 ILCS 5/2—615 (West 2006)). In the memorandum attached to their motion, defendants argued that plaintiffs' complaint should be dismissed because, among other things, plaintiffs failed to allege any facts to show that plaintiffs had made formal application to the City or that the City had made a final decision as to the application of the City's regulations to the subject property.

On April 10, 2007, the trial court granted defendants' motion to dismiss, stating in relevant part:

"I think definitively the judicial branch should not be sticking their nose into the executive branch on a land use issue like this, zoning issue like this until there has been a furtherance of the land owner's intent to develop the property, and a far greater definitive response than the indications that have come from Oakbrook Terrace.

There may be indications of that, and a developer walked away because of that, and this, that and the other, they're not part of our case either, but I think it needs to go further before it comes to the Judicial Branch.

And as such, I am going to dismiss your complaint on the basis of ripeness. I am not getting into the other aspects of the allegations of the sufficiency of your complaint one way or the other, and I want that very clear, *** the basis of the ruling is solely the ripeness issue.

But *** the amended complaint *** simply has not reached a ripeness level, nor have there been sufficient allegations of futility or frustration of purpose that leads this court to take the step into a determination of what the City of Oakbrook Terrace should or shouldn't do with this property and their handling of same. And as such, I am dismissing the complaint with prejudice on the basis of ripeness.

Certainly, once the whole process goes through and there is some definitive response from the City of Oakbrook Terrace and that response is one that may be [sic] Mr. Krylic [sic] does not agree with or sees a big financial difficulty with in regard to same, then I think there is an appropriate ripeness, and then I think a complaint can be filed, and then I think the Court can take that step in reviewing that process and providing a remedy for the inverse condemnation or the lack of market value or whatever it is that you may wish to toss into a complaint."

On May 9, 2007, plaintiffs filed a notice of appeal.

## II. ANALYSIS

On appeal, plaintiffs argue that the trial court erred in granting defendants' section 2—615 motion and dismissing with prejudice their first-amended complaint for lack of ripeness. A section 2—615 motion attacks the legal sufficiency of the complaint, based on defects apparent on its face. *Beacham v. Walker*, 231 Ill. 2d 51, 57 (2008). The relevant inquiry is whether the well-pleaded facts of the complaint, taken as true and construed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. *Loman v. Freeman*, 229 Ill. 2d 104, 109 (2008). The plaintiff

is required to allege facts, and not simply conclusions, sufficient to bring its claim within a legally recognized cause of action. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429-30 (2006). Based on these standards, a cause of action should not be dismissed in response to a section 2—615 motion unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief. *Beacham*, 231 Ill. App. 3d at 58. We review *de novo* a complaint's dismissal pursuant to section 2—615. *Karas v. Strevell*, 227 Ill. 2d 440, 451 (2008).

Although property may be regulated to a certain extent, a governmental regulation that goes "too far" will be considered as a taking. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 67 L. Ed. 322, 326, 43 S. Ct. 158, 160 (1922). Before a party may initiate an action alleging a taking, however, the claim must be ripe. *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 87 L. Ed. 2d 126, 139, 105 S. Ct. 3108, 3116 (1985). The ripeness doctrine is applied to avoid premature adjudication or review of administrative action. *Drovers Bank of Chicago v. Village of Hinsdale*, 208 Ill. App. 3d 147, 153 (1991). In the context of a land-use case, a claim that the application of government regulations effects a taking is not ripe until the government entity charged with implementing the regulations has reached "a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson County Regional Planning Comm'n*, 473 U.S. at 191, 87 L. Ed. 2d at 141, 105 S. Ct. at 3119.

The reason for the finality requirement is simple: "a court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348, 91 L. Ed. 2d 285, 294, 106 S. Ct. 2561, 2566 (1986). Stated differently, whether a taking has occurred cannot be determined until " 'the extent of permitted development' on the land in question" is known. *Palazzolo v. Rhode Island*, 533 U.S. 606, 618, 150 L. Ed. 2d 592, 608, 121 S. Ct. 2448, 2458 (2001), quoting *MacDonald, Sommer & Frates*, 477 U.S. at 351, 91 L. Ed. 2d at 295-96, 106 S. Ct. at 2567. As the Supreme Court explained, "[w]hile a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." *Palazzolo*, 533 U.S. at 620, 150 L. Ed. 2d at 609, 121 S. Ct. at 2459. Thus, to show that a final decision has been rendered, the party alleged to be aggrieved must demonstrate, at a minimum, that there was a rejected development plan. *Kinzli v. City of Santa Cruz*, 818 F.2d 1449, 1454 (9th Cir. 1987); *Drovers Bank of Chicago*, 208 Ill.

App. 3d at 153. Moreover, where a regulatory scheme offers the possibility of a variance, the property owner "must go beyond submitting a plan for development and actually seek such a variance to ripen his claim." *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 736-37, 137 L. Ed. 2d 980, 991-92, 117 S. Ct. 1659, 1666 (1997). Of course, as this court has previously recognized, a property owner may avoid the final decision requirement if attempts to comply with the requirement would be futile. *Drovers Bank of Chicago*, 208 Ill. App. 3d at 153. The property owner bears the burden of establishing, by more than mere allegations, that pursuing a final decision would be futile. *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1501 (9th Cir. 1990), *aff'd*, 526 U.S. 687, 143 L. Ed. 2d 882, 119 S. Ct. 1624 (1999). Plaintiffs have not carried their burden in this case.

Since the present appeal is from an order dismissing plaintiffs' first-amended complaint, the allegations in the complaint are considered true for purposes of the appeal. *Drovers Bank of Chicago*, 208 Ill. App. 3d at 150. Absent from plaintiffs' first-amended complaint, however, are any factual allegations showing that plaintiffs submitted any formal development plan to the City, much less that the City rejected a development plan and that the plaintiffs thereafter unsuccessfully sought a variance. Because plaintiffs have failed to seek any determination from the City as to how it would apply its zoning ordinances to the subject property, we agree with the trial court that plaintiffs' claim is premature. See *Agins v. City of Tiburon*, 447 U.S. 255, 260, 65 L. Ed. 2d 106, 111, 100 S. Ct. 2138, 2141 (1980) ("Because the appellants have not submitted a plan for development of their property as the ordinances permit, there is as yet no concrete controversy regarding the application of the specific zoning provisions"), *overruled on other grounds by Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 161 L. Ed. 2d 876, 125 S. Ct. 2074 (2005).

Despite their failure to seek the City's approval for development of the subject property, plaintiffs assert that they have met *Williamson County*'s final decision requirement because they already know the extent of development that will be allowed on the subject property. Thus, they assert, it would have been futile to present a formal development scheme to the City. As evidence for this position, plaintiffs cite to correspondence from the City, AvalonBay, and John Houseal, the municipal planner who reviewed the proposals submitted by AvalonBay. According to plaintiffs, Mazaika went to "great lengths" to ensure that AvalonBay understood that Houseal represented the City's position on AvalonBay's proposed development. Plaintiffs maintain that both of Houseal's written reports strictly apply the Unit 5 area plan and the M-U zoning, and they contend that Mazaika stressed

that every time AvalonBay met with the City or one of the City's representatives, AvalonBay had been "directed back" to those zoning classifications. Plaintiffs conclude that these communications demonstrate that the City intends to strictly adhere to the requirements of the Unit 5 area plan and the M-U zoning, which allow for the development of only seven dwelling units per acre. We disagree.

The documents cited by plaintiffs indicate that, given the density of the developments proposed by AvalonBay, the proposals reviewed by Houseal would likely meet resistance from the City. However, this is insufficient to satisfy the finality requirement. See *Northwestern University v. City of Evanston*, 74 Ill. 2d 80, 89 (1978) ("The exhaustion requirement cannot be avoided simply because relief may be, or even probably will be, denied by the local authorities"). Additionally, neither these documents nor any other evidence cited by plaintiffs shows to a reasonable degree of certainty the extent of development that would be allowed on the subject property. Plaintiffs claim that the documents evince an intention by the City to permit no more than seven dwelling units per acre. Yet, even following the issuance of Houseal's reports, AvalonBay conceded that, without formally presenting a plan for review, it was not sure of the overall density that the City would approve. Moreover, Houseal recognized in his reports that "[p]lanned unit developments typically provide the opportunity for a municipality to grant certain zoning relief or exceptions, if doing so permits the development to provide other desirable features." See *MacDonald, Sommer & Frates*, 477 U.S. at 353 n.9, 91 L. Ed. 2d at 297 n.9, 106 S. Ct. at 2568 n.9 ("Rejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews"). In fact, AvalonBay made several changes to its proposal as a result of its discussions with the City, only to have *plaintiffs* reject amendments to the contract to accommodate these concessions. We note further that while Mazaika indicated that Houseal represented the City's position, it is not a city planner who makes the final decision whether a development plan is approved or denied. Indeed, as Mazaika recognized, a formal petition must first be considered by the City's planning and zoning commission and then by the city council. Thus, plaintiffs' claim that the City intends to "strictly adhere" to the Unit 5 area plan and the M-U zoning is not supported by the record.

In fact, it is plaintiffs' failure to show to a reasonable degree of certainty the extent of development that would be allowed on the subject property that distinguishes this case from *Palazzolo*, the principal case upon which they rely. In *Palazzolo*, the plaintiff owned waterfront property in Westerly, Rhode Island, a large portion of which

was a salt marsh subject to tidal flooding. In order to develop the property, the marsh would have to be filled in. The plaintiff submitted multiple requests to develop the property. The first request proposed filling the entire marshland area. This proposal was rejected on the basis that it did not comply with a state agency wetland regulation. Thereafter, the plaintiff submitted a second plan in which 11 of 18 acres would be filled. This proposal was rejected for the same reason as the first proposal. The regulation in question required a landowner wishing to fill a salt marsh to secure a " 'special exception' " demonstrating that the proposed activity serves " 'a compelling public purpose which provides benefits to the public as a whole as opposed to individual or private interests.' " *Palazzolo*, 533 U.S. at 615, 150 L. Ed. 2d at 605-06, 121 S. Ct. at 2456, quoting Rhode Island Coastal Resources Management Program §130A(1) (as amended June 28, 1983). Ultimately, the plaintiff filed a complaint for inverse condemnation, asserting that the application of the regulation to his property constituted a taking in violation of the fifth and fourteenth amendments to the United States Constitution (U.S. Const., amends. V, XIV).

The Rhode Island Supreme Court dismissed the plaintiff's claim. Relevant here, the court held that the plaintiff's claim was not ripe because there remained doubt regarding the extent of development the state agency responsible for applying the regulation would allow. The United States Supreme Court reversed, holding that the plaintiff was not required to submit further applications to develop his property, because the agency's decisions made clear that state regulations barred the plaintiff from engaging in *any* filling or development activity on the marshland. *Palazzolo*, 533 U.S. at 621, 150 L. Ed. 2d at 609, 121 S. Ct. at 2459.

*Palazzolo* does not require a finding that plaintiffs' claim in this case is ripe for judicial review. *Palazzolo* holds that a decision is final when the government entity charged with implementing the regulations in question, after rejecting development proposals, makes clear that additional proposals will be denied. As we note above, aside from the fact that plaintiffs never sought approval for any development on the subject property, there is no indication that the extent of development that would be allowed on the subject property was determined in a concrete way or that any development proposal would be automatically rejected. Thus, *Palazzolo* is inapposite.

We are also unpersuaded by plaintiffs' claim that the City is using Houseal, its outside expert, "to pretend that they have not made a decision regarding what type of use the City will permit on the [subject property.]" The City hired Houseal to analyze AvalonBay's plans according to the zoning scheme in place at the time the proposals were

made. Since AvalonBay's proposals exceeded the allowable density for the zoning classification of the vacant property by more than 1,000 dwelling units, it should have been no surprise that Houseal's reports were unfavorable. Plaintiffs further assert that the government "may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision." See *Palazzolo*, 533 U.S. at 621, 150 L. Ed. 2d at 609, 121 S. Ct. at 2459, citing *City of Monterey*, 526 U.S. at 698, 143 L. Ed. 2d at 897, 119 S. Ct. at 1633. However, in *City of Monterey*, it was only after "five years, five formal decisions, and 19 different site plans" that the property owner decided the government would not permit development of the property under any circumstances. *City of Monterey*, 526 U.S. at 698, 143 L. Ed. 2d at 897, 119 S. Ct. at 1633. The allegations against the City in this case do not approach the extent of the actions taken by the municipality in *City of Monterey*.

Finally, plaintiffs assert that in November 2003, prior to the City's decision to rezone the subject property to the M-U classification, they proposed a development on the subject property. According to plaintiffs, they asked the City to delay voting on the rezoning proposal and consider their development plans, which consisted of 1,939 dwelling units. The City declined plaintiffs' request and voted to rezone the subject property. Plaintiffs now assert that the City's "down zoning" of the subject property without even responding to their development proposal constituted an effective denial of their development plans, thereby making plaintiffs' claim ripe for adjudication. However, as defendants point out, as a general matter, there is no vested right to the continuance of a zoning classification. *Ropiy v. Hernandez*, 363 Ill. App. 3d 47, 52 (2005). Moreover, plaintiffs never presented to the City a formal plan for the 1,939-unit development. Rather, in the words of plaintiffs' representative, nothing more than a "quick overview of what [plaintiffs] are proposing for the property" was presented to the City at that time. Therefore, this argument does not persuade us that plaintiffs' claim is ripe for review.

## III. CONCLUSION

For the reasons set forth above, we affirm the judgment of the circuit court of Du Page County dismissing with prejudice plaintiffs' first-amended complaint, for lack of ripeness.

Affirmed.

McLAREN and SCHOSTOK, JJ., concur.